JANVIER, Judge.
This action in damages results from the fact that when, on January 2, 1962, an abdominal operation was performed on Mrs. Monty Tyler Grant, a small 4x4 inch gauze sponge was accidentally left in her abdomen when the incision was sutured. When pain and suffering later developed an X-ray examination disclosed this fact and, on August 31, 1962, the same surgeon who had performed the first operation surgically removed the sponge.
Plaintiff and her husband, John F. Grant, brought this suit seeking recovery, Mrs. Grant praying for judgment for $50,000.00 and he for $11,000.00 to cover the medical expenses which had been incurred and which might become necessary in the future.
Defendants are Touro Infirmary (hereinafter referred to as Touro) the hospital in which both operations were performed, its liability insurer, Hardware Mutual Casualty Company (hereinafter referred to as Hardware), New Amsterdam Casualty Company (hereinafter referred to as New Amsterdam), the liability insurer of Dr. Abe Golden, the surgeon who performed both operations. Dr. Golden himself was not made a defendant in the suit by Mr. and Mrs. Grant.
Touro answered, pleading that, as a charitable institution, it was immune and could not be sued in matters such as this. New Amsterdam admitted that it had issued a policy to Dr. Golden, but denied any fault on his part and averred that he was highly competent and prayed for a dismissal of the suit. Hardware filed an exception of no cause of action and moved for summary judgment, averring that its policy which had been issued to Touro contained an exclusion of liability wherever claim was made based on a charge of fault in the rendering of medical, surgical or nursing services.
By amendment plaintiffs prayed for trial by jury.
Touro also in its answer denied liability, averring that Dr. Golden was a competent and qualified physician and that he had been in sole charge of the operation and that, at the time of the first operation, “all personnel in the operating room were under the sole direction of Dr. Abe Golden and were his servants and agents.”
Hardware, reserving its rights under its exception of no cause of action, especially denied that the policy which it had issued to Touro covered liability “against the risks and claims here in suit.” Then Hardware, by third party petition, averred that if Dr. Golden and Touro were both held to be at fault and that it be held that its policy did insure Touro with respect to plaintiffs’ claims, the fault of Touro was only vicarious and secondary to that of Dr. Golden, and that if any judgment should be rendered against it, it should have judgment for a like amount against Dr. Golden and his insurer. As a further alternative, it prayed that should it be held that Touro and Dr. Golden were joint tort feasors, it should be entitled to contribution from Dr. Golden and his insurer.
New Amsterdam and Dr. Golden, as third party defendants, denied that there had been any fault on the part of Dr. Golden and prayed for dismissal of the third party action by Hardware.
Touro, as third party plaintiff, made its insurer, Hardware, a third party defendant and called on it to defend the suit against it and prayed for judgment against Hardware “ * * * for attorneys’ fees, all reasonable expenses as well as for all loss and damages Touro Infirmary may sustain by reason of the occurrence.” Touro then moved for a summary judgment averring that Dr. Golden had been in complete charge of the operation and that Touro could not be held liable.
Hardware answered the third party petition of Touro, denying that its policy covered the claims of plaintiffs and prayed that the third party petition of Touro against it be dismissed.
New Amsterdam denied that Dr. Golden had been at fault, but in the alternative *238 prayed for judgment against Touro and Hardware and Touro filed a third party petition against New Amsterdam, praying that it have judgment over and against New Amsterdam for “full indemnity” or in the alternative “for contribution as between joint tort feasors.”
At this stage of the proceedings the motion for summary judgment filed by Touro was sustained and the suit as against it was ordered dismissed. On appeal we reversed that judgment and remanded the matter (Grant v. Touro Infirmary, La.App., 169 So.2d 574) for presentation of possible additional evidence on facts “raised by depositions of the operating physician, observing physician, and assisting nurse.”
Plaintiffs rely upon the doctrine of res ipsa loquitur, and, contending that no actual proof of negligence is necessary, charge negligence on the part of the surgeon in that he had not ascertained that no foreign body remained in the abdomen of Mrs. Grant before the incision was sutured, and on the part of Touro in that that institution provided the nurses and other employees who had assisted in the first operation and who must have been at fault in the counting of the sponges.
Having carefully studied the evidence we feel that there can be no question that there was error in the counting of the sponges and that no other evidence than the finding of the sponge later is necessary to indicate fault.
We say here exactly what was said in Danks v. Maher, La.App., 177 So.2d 412:
“We do not agree with appellants’ first contention, that the record contains no evidence of an incorrect count. The question of whether the unfortunate incident was caused by an incorrect count was one of fact determined by the jury adverse to appellants and there is sufficient evidence to support that finding. It is true there is no testimony directly to the effect that an incorrect count was made. But a correct lap count must be one in which all the squares used are accounted for. Here, although the count was recorded as correct, it is quite clear that a lap square was allowed to remain in plaintiff’s abdominal cavity as a result of the operation (it was removed by the second operation), and there is no evidence at all that an additional square was used by the doctor after the count was taken.”-
The matter was tried by jury which rendered judgment against all defendants, Touro, New Amsterdam and Hardware, in solido, in the sum of $18,000.00. It dismissed all other claims. All defendants have appealed, and Touro has especially appealed from the judgment insofar as it did not allow a recovery by it against Hardware to cover its attorney’s fees and costs.
There were submitted to the jury several questions of fact and we find interesting the jury’s finding on certain of these questions. It was held that Touro was not a charitable institution and is not entitled to the immunity claimed. It found that there had been a miscount of the sponges; that Touro had not exercised due care in the selection of nurses and employees to assist Dr. Golden in the operation; found that Dr. Golden had not been negligent; that both Touro and Dr. Golden had had direction and control of the nurses when the count of the sponges was made, and that the miscount was a proximate cause of the injury to Mrs. Grant.
Were it not for the fact that the jury made the several findings of fact to which we have referred, we would have no difficulty in determining those facts and we could then attempt to apply to them certain conclusions of law based on earlier decisions of this and other courts.
We first consider the findings of the jury that Touro was not a charitable and non-profit institution. We find in the record no foundation for this finding of the jury. As far back as 1922, in Jordan v. Touro Infirmary, La.App., 123 So. 726, the Court of Appeal for the Parish of Or *239 leans, the predecessor of this Court, held Touro to be such an institution, giving all the facts concerning the founding of that institution. There the Court quoted with approval the following:
“ ‘Those who furnish hospital accommodations and medical attendance, not for the purpose of making profit thereby, but, out of Charity, or in the course of the administration of a charitable enterprise, are not liable for the malpractice of the physicians or the negligence of the attendants they employ, but are responsible only for their own want of ordinary care in selecting them.’ 4 L.R.A. (N.S.) 68.
“ ‘The test which determines whether such an enterprise is charitable or otherwise is its purpose. If its purpose is to make profit, it is not a charitable enterprise. If it is to heal the sick and relieve the suffering, without hope or purpose of getting gain from its operation, it is charitable.’ 4 L.R.A. (N.S.) 68.”
While the finding made in the Jordan case in 1922 is not controlling on that subject at this time, we find it quite persuasive.
It is true that the evidence in the case before us indicates that during the year 1962 Touro had a total income of $5,500,000.00 and that the actual cash value of the charitable services it rendered was $276,000.00. However, it is shown that the actual cost of the services rendered by Touro for all patients exceeds considerably the actual income and that the balance is necessarily made up by other contributions and that in no sense can it be said that Touro is operated for profit. We conclude that Touro is a charitable institution and as such is entitled to immunity wherever the facts make the doctrine applicable.
Counsel for New Amsterdam have devoted much effort in an attempt to convince us that the doctrine of charitable immunity, which has been recognized in this State, has outlived its usefulness and should be abandoned. Counsel point out that that doctrine originated in Great Britain in 1846 and was discarded there some twenty years later. They say that the doctrine was adopted in Massachusetts in 1876 and in Maryland in 1885 and that it has been adopted in many other states since, but that it has been abandoned by many. They point to this fact and quote the following from Prosser on Torts, § 127, p. 1024: “It may be predicted with some confidence that the end of the next two decades will see its virtual disappearance from the American Law.”
Counsel have been so sincere in their presentation of this contention that we have given it much consideration. We feel, however, that if that doctrine, which has been recognized in Louisiana for so long, is to be abandoned, that action must be taken either by legislative enactment or by our Supreme Court which, in the latest case in which it was held that the charitable immunity exists, that is, D’Antoni v. Sara Mayo Hospital, La.App., 144 So.2d 643, refused to grant a writ of certiorari.
The question which arises is whether the facts here make the doctrine of charitable immunity applicable to Touro.
For many years our courts have considered the possible distinction in its effect on charitable immunity between a nonmedical nonprofessional act and an act which may be performed by any person not being a doctor or specialist qualified to perform an act which may be performed only by such a specialist.
Considerable confusion has resulted, due to the fact that it is often very difficult to reach a conclusion as to whether the act which caused the injury was one which is normally performed by any employee and which does not require the application of any unusual or expert training, or is an act which none but such a professional should undertake.
Quite recently, in 1965 and 1962, this question was discussed by this Court *240 in two cases, Danks v. Maher, supra, and D’Antoni v. Sara Mayo Hospital, supra. As a result of those two decisions we have found it most difficult to reach a conclusion here. In both there was recognized a distinction between the two kinds of acts we have referred to. However, although in the Danks case we held the hospital for negligence in the performance of an administrative act, in the D’Antoni case, though the fault was committed by an employee acting in a purely administrative capacity— failing to raise the side rail of a patient’s bed — we held the hospital not liable for the injuries which resulted when the patient fell from the bed. In that case we said:
“In our opinion the action of the hospital’s employees in not maintaining the side rails on plaintiff’s bed did not involve professional judgment and was not a ‘failure to render medical * * * or nursing service or treatment’ nor was it ‘failure to render any service or treatment conducive to health or of a professional nature’.
“It seems to us that in determining whether or not a particular act or failure to act is of a professional nature we should look not to the title or the character of the party performing the act but to the act itself. The raising of the side rail was purely a mechanical act which any unskilled person could perform. It certainly requires no professional training or knowledge.”
We recognized the fact that the immunity must be relied on in the administrative case and that if it is not relied on, there may be liability whereas in the case of medical mistake it is not the immunity which will relieve the hospital from liability but the fact that it cannot be held liable because of the doctrine of respondeat superior has no application where the institution sought to be held liable has no power to control the operations of the specialist who is engaged in the doing of work in which he is a specialist and in which work he should not be interfered with. In other words, all that a hospital can do is to use all proper care in selecting its specialized employees such as doctors, surgeons and registered nurses and that when it has used such care, it cannot be held liable on the ground that under the doctrine of respondeat superior it is responsible for the failures of those specialists in whose selection the hospital has exercised proper care.
In Messina v. Societe Francaise De Bienfaissance etc., La.App., 170 So. 801, 806, the author, in a concurring opinion, said:
“ * * * If, in the selection of these employees, the hospital authorities have exercised due care, I feel that it would be improper to hold the hospital itself liable for errors of judgment which may be committed by such employees in carrying out the special orders of the private physicians. To hold otherwise is to hold that in such cases hospitals are the guarantors of the perfection of those employees ; that they are the insurers of the patients. All that such hospitals should be held to have undertaken in such cases is the duty of providing employees properly trained to perform the particular services which are customarily permitted or required to be performed by such employees. If, in operating such services, such employees commit errors of professional judgment; there should be no liability in the hospitals employing them. Obviously, there is no right in the hospital to direct or to supervise such employees in the exercise of professional judgment. The doctrine, respondeat superior, is founded on the right to direct or supervise.”
If the two cases above referred to may not be reconciled on the grounds we have set forth, we would direct attention to the fact that although the Danks case, in which recovery against the hospital was permitted, was decided on July 15, 1965, more than three years after our decision in the D’An-toni case in which we held the hospital immune, a writ of certiorari which was applied *241 for was refused, whereas no writ of cer-tiorari was applied for in the Danks case.
We conclude that here the facts justify the conclusion of immunity and that, accordingly, since Touro pleaded immunity no judgment should have been rendered against Touro. However, we repeat what we said in D’Antoni v. Sara Mayo Hospital, supra, that “the defense of charitable immunity is personal to the hospital and is not available to the hospital’s public liability insurer.”
When we come to consider the question of whether the surgeon may not have been himself at fault in not discovering that there was a sponge remaining in the abdomen before he sutured the incision, we first note that the jury, on this question of fact, found that the doctor was not at fault and this caused us to wonder whether, even if the surgeon took no part in this count, there might have been something that he should do in a last effort to determine whether any foreign body may have been left. We realize, of course, that the doctor himself cannot be expected to keep account of the sponges which are passed to him for use and which are removed by him after use. We noticed, too, that each of these sponges has a thread which is radioactive and we wondered whether it would not have been the custom to attempt by X-ray examination to find that a sponge still remained: We wondered also whether a surgeon should not, by manual examination, make certain that no foreign body had been left. However, there is expert testimony on these two questions, and on both the evir dence overwhelmingly indicates that it is not customary to make either an X-ray examination or for the surgeon to make a manual search.
Dr. George F. Sustendal, an expert gynecologist, was asked: “ * * * is it customary or generally accepted practice in this community for a gynecologist having had reported to him a correct sponge count, to order an X-ray examination of his patient be done”? He answered: “No.” Dr. Sustendal was also questioned concerning the advisability of a manual examination, and he was asked whether it was considered good practice to “feel around in the body organs, searching for any foreign body that might have been in there,” and he said that “very definitely there was reasons why not.” The reasons which he gave were that “any handling of the viscera makes that patient more prone to a condition we call paralytic ilius. It’s a surgical axiom that you try not to handle anything that you’re not going to work on,” and that “this is for the patient’s welfare.”
Dr. Charles J. Miangolarra, a surgical expert, was asked “what if anything should the surgeon have done if a correct sponge count was given just before he started h> close the peritoneum,” and he answered: “Just proceed with the closure.” He was also asked “why is it difficult to just look in and see if there’s a sponge there, why can’t you do that”? He answered that “everything is loose in the abdomen and rolls all over the place, so that a search, to be done and to have a complete one, would mean to temporarily eviscerate the patient.” Asked what that meant, he said: “That means to take everything out that can be taken out of the abdomen in orderly fashion.” The doctor was also questioned concerning the advisability of an X-ray examination to determine whether any foreign body has remained and he testified as follows:
“Q. * * * assuming that at the case of a hysterectomy the surgeon has been given a correct sponge count and closes it up, are you familiar with the customary and general accepted procedure in the community of the City of New Orleans, and if so do you know whether or not under such circumstances it would be customary and routine for the surgeon to then say, “Let’s get an X-ray of the field, of the area of the surgery?”
“A. No, I don’t know of any surgeon who does that unless there’s a question of some opaque object remaining in the ab *242 domen that can’t be accounted for outside of the abdomen.
“Q. Do I understand you correctly that •ordinarily—
“A. It’s not routine.
“Q. It would not be done?
"A. No.
“Q. And if a sponge count was given as correct, a doctor would not, to be excessively prudent or excessively cautious, have a routine X-ray made after such operation ?
“A. No.”
Considering further the question of the possibility that the surgeon may have been at fault himself in not making certain that the count was correct, we note that the record shows that every time a sponge is handed to the surgeon there is a large metal holder with which it is handled; that at no time should the sponge ever be separated from the holder, and that whenever, if it happens, a holder is handed back to one of the nurses and there is no used sponge attached to it, immediately a search is made to locate the sponge which has been disconnected from the holder. Accordingly, it seems impossible that the doctor could have himself left a sponge in the open abdomen and passed back a holder without a sponge attached to it.
Considering the evidence of the experts and considering also how the sponges are handled by the surgeon, we conclude that the jury was correct in finding that the doctor was not at fault.
Since we feel that fault of the employees who were responsible for the counting of the sponges was the sole cause of the leaving in of the sponge, it becomes necessary to determine whether those employees became the borrowed employees of the surgeon or remained the employees of the hospital. If they became the employees of the surgeon, under the doctrine of re-spondeat superior, he became liable for their fault, and if they did not become his employees, then they remained the employees of Touro and Touro would become liable, subject to its immunity, for their fault and Touro’s insurer, not protected by the immunity of Touro, would be liable for the entire disaster.
A careful study of the evidence as to how those employees were selected and as to how they performed the duties connected with the counting of the sponges convinces us that the facts here cannot be distinguished from those found in the Danks case. There we said that the evidence, which we find the same as the evidence here, was sufficient to support the finding that on that question of fact the employees were the servants of Touro and did not become servants pro hac vice the surgeon.
We conclude that the nurses were not the borrowed servants of the surgeon since we find that the facts here were identical with those which we found in the Danks case, in which we said:
“The borrowed servant rule is based on the doctrine of respondeat superior and is founded primarily on the right to direct and supervise. The record in the instant case does establish that generally the hospital employees in the operating room during the surgery were under the direction and supervision of the defendant doctor. But they were not under the doctor’s complete direction and supervision with regard to the taking of the lap count. Under the routine surgical procedure established by the hospital staff the nurses were required to take that count in the manner so established, including the taking of a count out of the doctor’s presence prior to his entrance into the operating room, whether or not the count taken during the operation was ordered or required by the surgeon.”
*243 It may be that this finding would seem to conflict with the finding in Jordan v. Touro Infirmary, supra, in which we said:
“As we have seen from the testimony that the nurses are absolutely under the' orders of the surgeons in the operating room and in no manner controlled by the officers of the defendant, it has no responsibility for the acts of the nurses. They may be considered, pro hac vice, as the servants of the surgeon. In this case the surgeon was employed by plaintiff himself.”
However, we said in the Danks case that the question of whether or not the employees of the hospital become the borrowed servants of the surgeon is a question of fact. We also said in the Danks case that there was sufficient evidence to support the finding that the nurses did not become the borrowed servants of the surgeon.
There remains for consideration only the' question of whether, under the terms of its policy, Hardware should have undertaken the defense of the suit against Touro.
On facts which we are unable to distinguish from those found here, we held in the Danks case that the counting of the sponges as they are used and as they are disposed of after use cannot be considered as medical or professional operations and that they are, therefore, merely administrative functions which do not require professional skill. Accordingly, liability for mistakes made in such counting is not excluded from coverage of the liability policy which Hardware issued to Touro. It necessarily follows that although Touro itself, was immune against liability for the results of that mistake, the immunity affords no protection to the insurer.
We feel that even if it could have been held that the miscount of sponges was a medical professional fault, that was such a controversial question that the defense should have been undertaken by Touro’s insurer.
We note that the claim of Touro for payment of the services of its attorneys’ fees was dismissed, and we think that this dismissal was erroneous.
The services of the attorneys who undertook the defense of Touro were performed under the eyes of the District and this Court. They were extensive as is made evident by the size of the enormous record and the careful research indicated by the argument and by the brief.
The attorney who had charge of the defense of Touro testified as to the extent of his services and an experienced member of the Bar, who testified as an expert, valued the services at $6,000.00. In D’Antoni v. Sara Mayo Hospital, supra, a case somewhat resembling this case, $4,000.00 was allowed for services. We think that the $6,000.00 claimed here is not excessive.
Accordingly, the judgment appealed from is reversed insofar as it runs against Touro Infirmary and against New Amsterdam Casualty Company, and insofar as it dismisses the claim of Touro Infirmary against' Hardware Mutual Casualty Company, and it is affirmed insofar as it runs in favor of Mrs. Monty Tyler, wife of/and John F. Grant against Hardware Mutual Casualty Company in the sum of $18,000.00 with legal interest from judicial demand and costs.
There is now judgment in favor of Touro Infirmary and against Hardware Mutual' Casualty Company in the sum of $6,000.00, together with the costs incurred by Touro Infirmary.
Reversed in part.
Affirmed in part.