383 So.2d 83 (1980)
Armand RICHARD, Plaintiff-Appellee,
v.
SOUTHWEST LOUISIANA HOSPITAL ASSOCIATION and St. Paul Fire & Marine Insurance Company, Defendants-Appellants.
No. 7474.
Court of Appeal of Louisiana, Third Circuit.
April 9, 1980.
Writ Refused June 6, 1980.
*85 Raggio, Cappel, Chozen & Berniard, Richard B. Cappel, Lake Charles, for defendants-appellants.
Jones, Jones & Alexander, J. B. Jones, Jr., Cameron, for plaintiff-appellee.
Before DOMENGEAUX, FORET and SWIFT, JJ.
DOMENGEAUX, Judge.
This was a jury case. The defendants, Southwest Louisiana Hospital Association and its insurer, St. Paul Fire & Marine Insurance Company, appeal an adverse judgment of the trial court, holding them liable for damages resulting from the use of a defective catheter in plaintiff, Armand Richard, while he was a patient in Lake Charles Memorial Hospital. We affirm.
On September 6, 1974, Armand Richard was hospitalized at Memorial for a fracture of his right leg. For some reason he began to retain urine in his bladder and a catheter was inserted for several days. Thereafter a stricture, or mass of scar tissue formed in his urethral canal, which restricted the passage of urine and caused difficulty in urinating. Slightly over a year after that hospitalization Mr. Richard consulted Dr. John W. Melton, III, a urologist practicing in Lake Charles.
Doctor Melton performed several sounding procedures in an attempt to alleviate the stricture. However, in March of 1976 he decided that more complicated surgery was required. On March 8, 1976, he performed, at defendant hospital, what is known as a "patch urethroplasty".[1] In doing so, it was necessary for the physician to place a Foley[2] catheter in Mr. Richard's urethra.
The Foley catheter is inserted through the urethra into the bladder. It has a small balloon on its forward end which is inflated with a sterile liquid after entering the bladder. The catheter is then pulled back until the balloon is seated in a position in the bladder which completely blocks the flow of urine through the urethra and thereafter the urine drains from the bladder through the catheter.
On the third post-operative day Richard suffered a bladder spasm which caused the catheter to dislodge and slip down a short distance in his urethra. It was re-inserted, but some urine had been permitted to pass in the area of the surgery that had an adverse effect on the skin graft. Later it was determined that the balloon of the catheter had a minute leak. The urine leaked out through the new suture line and into the tissues, resulting in the failure of the patch urethroplasty, and plaintiff's subsequent difficulties.
The plaintiff underwent further surgery, known as a "Johannsen urethroplasty" which was performed by Dr. C. E. Carlton in Texas. This was done in two operations, the first on September 21, 1976, and the second on January 17, 1977.[3]
*86 On October 25, 1976, Armand Richard filed suit against Southwest Louisiana Hospital Association, the hospital group of which Memorial is a member, and its insurer.
On September 16, 1977, Richard filed a supplemental and amending petition naming Travenol Laboratories, Inc. as an additional defendant co-tortfeasor, alleging it was the manufacturer of the defective Foley catheter that caused injury to the plaintiff.
Travenol filed an exception of prescription which was referred to the merits by the trial judge.
The jury trial began on May 21, 1979. At that time Richard filed a motion and obtained an order dismissing Travenol, by reason of a compromise settlement with the latter for the sum of $5,000.00.
The jury found in favor of the plaintiff and awarded him $81,500.00.
Thereafter, the defendants filed a rule to show cause why the judgment should not be reduced by one-half under Harvey v. Travelers Insurance Company, 163 So.2d 915 (La.App. 3rd Cir. 1964). The rule was denied. It also asked for a new trial limited to the question of whether Travenol was the manufacturer of the defective catheter. This request was also denied.
This appeal followed.
We cite appellants' specifications of error and will consider them in the following order:
I. The trial judge committed error in permitting cross-examination of defendants' employees with textbooks not properly offered into evidence.
II. The jury verdict that defendant hospital knew or should have known of the defect in the Foley catheter, and its finding that the hospital was negligent in its medical treatment of plaintiff was manifestly erroneous.
III. The trial judge erred in refusing to charge the jury that a nurse providing professional services in the operating room under the direction and supervision of the surgeon is considered to be a borrowed employee of the surgeon, consequently any negligent acts or omissions on the part of the nurse while under the direction and supervision of the surgeon relieves the hospital of any responsibility for such negligence.
IV. The damages awarded plaintiff were excessive.
V. The trial judge should have granted a new trial limited to the question of whether Travenol Laboratories, Inc. was the manufacturer of the defective catheter.
VI. The trial judge should have reduced the jury award by one-half in accordance with Harvey v. Travelers Insurance Co., 163 So.2d 915 (La.App. 3rd Cir. 1964).

SPECIFICATION I
Plaintiff presented as a witness Ms. Linda Jane Jones, a graduate nurse with a B.S. degree in nursing education from the University of Texas, and an M.A. degree in nursing education from the University of Minnesota. At the time of trial she was head of the Department of Nursing at McNeese State University at Lake Charles. Ms. Jones had been head of the department for seven years and had been associated with the University for some twenty years. She was presented two editions of a textbook entitled "Bedside Nursing Techniques in Medicine and Surgery" authored by Audrey Latsham Sutton, a registered nurse. The first edition was dated 1964, and the revised edition was dated 1969. Ms. Jones recognized these texts and testified that the author thereof, Ms. Sutton, was a competent authority on the subject of nursing techniques. She was tendered for cross-examination, and testified that ". . . although this book is outdated, there are still procedures that are in use today and are appropriate for today. And on the basis of that, I would say what she [Ms. Sutton] has in this book is correct." After this testimony *87 plaintiff's attorney offered, without objection, both texts, at which time the District Judge stated "Let the offerings be received."
Later, plaintiff's attorney called as a witness, Mrs. Rita Rains, a licensed practical nurse and certified surgical technologist. Mrs. Rains was an employee of the defendant hospital and was the circulating nurse attending plaintiff at the time of his surgery on March 8, 1976. Based on the fact that she was an employee of the defendant hospital, plaintiff's counsel was allowed to question her under cross-examination. During the course of her cross-examination she demonstrated the use of a Foley catheter. She was familiar with testing techniques of such a catheter. She was presented the two texts which had been previously admitted in evidence, at which time counsel for defendant hospital, although admitting that the texts had been offered in evidence, objected to Mrs. Rains testifying in connection with them. The trial court overruled the objection, at which time upon questioning by plaintiff's counsel, the witness read to the jury from both texts the following paragraph:
"A (Reading): The Foley catheter is the only catheter effectively used as an indwelling catheter. The inflation balloon should be tested before insertion. With a 5 cc. bag, two or three cc.'s of sterile solution or air is sufficient to hold the catheter in place. Always make certain that the catheter is in place in the bladder before inflating the balloon."
Counsel for plaintiff then asked her if she agreed with the statement contained in Ms. Sutton's texts, to which she answered "I suppose so."
We find it unnecessary to determine whether or not the two textbooks were properly offered into evidence, inasmuch as defendant counsel raised no objection at the time that they were offered and received into evidence. As was stated in Chivers v. Couch Motor Lines, Inc., 159 So.2d 544 (La.App. 3rd Cir. 1964):
"It is well settled that `A rule of evidence not invoked is waived, and hence a failure to object to evidence waives objections to its admissibility.' 88 C.J.S. Trial § 115, p. 230. Cf. also, 32 C.J.S. Evidence § 863, p. 796. A failure to object to hearsay or secondary evidence when admitted at the trial constitutes a waiver of the right to object to its admissibility; such evidence may then be considered and given probative effect; and a party may not subsequently upon appeal urge that such evidence was actually inadmissible." (Citations omitted.)
See also Bowlin v. Herrin Transportation Company, 187 So.2d 167 (La.App. 2nd Cir. 1966).
We also note that the referred to texts made no distinction between a re-usable and a disposable catheter.
We therefore conclude that defendant's Specification No. I is without merit.

SPECIFICATION II
We find that the medical evidence shows that plaintiff's difficulties after the March 8, 1976 patch urethroplasty were caused by the defective Foley catheter used in that operation.
The sole determining factor concerning negligence on the part of the defendant hospital is whether or not it should have tested the Foley catheter for defects before it furnished it for use on the plaintiff at the time of the March 8, 1976 operation. Until approximately the year 1970, the defendant utilized re-usable Foley catheters. It was the practice of the hospital to test these re-usable products prior to insertion in a patient. Subsequently, the hospital began using a pre-packaged, pre-sterilized, and disposable Foley catheter, the type used on plaintiff in this case. This latter type is manufactured by numerous manufacturers, and it is unclear, as shown hereafter, who the actual manufacturer of this one was. Apparently, the hospital did not require pre-testing since it began using the new type catheter, and the one in this case was not pre-tested. A Foley catheter can properly be tested before use by simply filling *88 the balloon part with a saline solution, and in the event that the balloon has a hole in it, the liquid will escape. Air can also be used instead of the saline solution.
Doctor Melton and two other urologists in the Lake Charles area testified that they do not pre-test these disposable Foley catheters before use.[4] Testimony of certain nurses employed by defendant also testified that they were not pre-tested by the hospital personnel.
On the other hand, it was clearly shown that before the new type catheters were utilized by the hospital, pre-testing was done. Mrs. Lillie Himel, a graduate nurse who was the operating room supervisor at defendant hospital testified that the manufacturers in product literature do not recommend testing pre-packaged catheters, but she also admitted that she never saw a manufacturer's recommendation or suggestion that the pre-packaged catheter not be tested.
The standard of care required of a hospital does not require a "community standard" in order to make a determination of negligence. A hospital's standard of care was stated recently in the case of Bryant v. St. Paul Fire & Marine Insurance Co., 365 So.2d 537 (La.App. 3rd Cir. 1978), writ refused 367 So.2d 1184 (La.1979), as follows:
"This court, in the case of Williams v. Sisters of the Incarnate Word of Galveston, Texas, 341 So.2d 1299 (La.App. 3rd Cir. 1977), set out the standard of care a hospital owes to its patients, wherein the court stated as follows:
`In the case of Hunt v. Bogalusa Community Medical Center, 303 So.2d 745 (La.1974), our Supreme Court has stated the duty of a hospital toward its patients as follows:
`"A hospital is bound to exercise the requisite amount of care toward a patient that the particular patient's condition may require. It is the hospital's duty to protect a patient from dangers that may result from the patient's physical and mental incapacities as well as from external circumstances peculiarly within the hospital's control. A determination of whether a hospital has breached the duty of care it owes to a particular patient depends upon the circumstances and the facts of that case."
`However, the hospital's duty has been traditionally limited by the jurisprudence, and the oft-quoted limitation has been recently reiterated in Goodeaux v. Martin Hospital, Inc., 333 So.2d 717 (La.App. 2nd Cir. 1976):
`". . . On the other hand, a private hospital is not an insurer of a patient's safety, and the rules as to the care required are limited by the rule that no one is required to guard against or take measures to avert that which a reasonable person under the circumstances would not anticipate as likely to happen. (Emphasis added)"
`See also Guidry v. State, Department of Hospitals, 317 So.2d 222 (La. App. 3rd Cir. 1975), writ refused, 320 So.2d 904 (La.1975); LeBlanc v. Midland National Insurance Company, 219 So.2d 251 (La.App. 3rd Cir. 1969); Killgore v. Argonaut-Southwest Insurance Company, 216 So.2d 108 (La.App. 2nd Cir. 1968), and DeBlanc v. Southern Baptist Hospital, 207 So.2d 868 (La. App. 4th Cir. 1968).'"
The jury, in awarding plaintiff damages, found that the defendant hospital, its agents, employees, etc., sold a defective Foley catheter to the plaintiff, and that the hospital, its agents, employees, etc., either knew or should have known of the defect in the catheter. It follows logically, in view of its finding, that: (1) the jury concluded that the catheter should have been pre-tested by the hospital, its agents, employees, etc.; (2) if the catheter would have been *89 pre-tested the defect therein would have been discovered; and (3) the defect in the catheter caused the injury complained of by plaintiff.
We have carefully reviewed the evidence in this case, and applying the standards of appellate review as set out in Canter v. Koehring Co., 283 So.2d 716 (La.1973); and Arceneaux v. Domingue, 365 So.2d 1330 (La.1978), we cannot say that the jury's verdict was manifestly erroneous or clearly wrong.
Defendant hospital suggests that the case of Holliday v. Peden, 359 So.2d 640 (La.App. 1st Cir. 1978) is authority for relieving it of responsibility. In Holliday, a pre-sealed, disposable suturing needle broke while the doctor was performing a tonsillectomy on the plaintiff therein. We distinguish Holliday basically on the proposition that the jury found no defect in the needle. Additionally, there was no testing procedure indicated for an instrument of this kind. The doctor involved in Holliday was held liable under the doctrine of res ipsa loquitur, in that the evidence showed that the needle was bent prior to breaking because of excessive stress, and that the doctor knew plaintiff's chronic tonsillitis caused toughened tissue, and therefore did not exonerate himself from the inference of negligence. The hospital and the manufacturer of the needle were exonerated.

SPECIFICATION III
Appellants requested that the following charge be given to the jury:
"A nurse providing professional services in an operating room under the direction and supervision of a surgeon is considered to be a borrowed servant of the surgeon and the hospital has no responsibility for the negligent acts or omissions of the nurse during the time she is acting under the direction and supervision of the surgeon."
They cited as authority therefor the cases of Jordan v. Touro Infirmary, 123 So. 726 (La.App., Orleans, 1922); Danks v. Maher, 177 So.2d 412 (La.App. 4th Cir. 1965); and Grant v. Touro Infirmary, 207 So.2d 235 (La.App. 4th Cir. 1968).
The trial judge refused to give that charge, citing the decision of the Supreme Court in LeJeune v. Allstate Insurance Company, 365 So.2d 471 (La.1978) as authority. In the LeJeune case, the Supreme Court held that both a general and a special employer may be solidarily liable in tort to a third person injured by an employee's negligent act.
We find no error by the trial judge in refusing this charge for the reason given by him.

SPECIFICATION IV
The jury awarded plaintiff the sum of $81,500.00. There was no breakdown by the jury of its award. Appellee proved medical expenses in the amount of $6,983.54. The medical evidence prevails that the defect in the Foley catheter inserted into plaintiff at the "patch urethroplasty" operation of March 8, 1976, allowed urine to permeate the raw skin graft and thereby was the cause of infection and strictures developing in the urethral canal resulting in plaintiff's subsequent difficulties. Two subsequent operations known as "Johannsen urethroplasty" were performed by Doctor Carlton. Between the operations of March 8, 1976, and the last operation of January 17, 1977, numerous procedures were employed in an attempt to correct the urethral strictures which had developed. For a period of approximately two and one-third years plaintiff suffered substantial pain because of swelling of his organs and difficulty in urination. There was evidence of difficulty in ejaculation. There is substantial scarring and angling of the male organ, and some discoloration. He was disabled during a portion of the two and one-third year period. Although his claim for lost wages ($12,000.00) was not definitively shown, it is clear that some lost wages were proven. The various surgical procedures which were required to alleviate his condition and their results were obviously painful, burdensome, and restrictive. We find no abuse of discretion in the jury award. *90 Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1977); Schexnayder v. Carpenter, 346 So.2d 196 (La.1977).

SPECIFICATION V
On the morning of the trial plaintiff entered into a compromise agreement with the second defendant, Travenol, for the sum of $5,000.00. Apparently the trial judge, in chambers, informally ordered that the compromise settlement with Travenol not be referred to before the jury because of possible prejudice as recognized in Canter v. Koehring Company, supra. We do not find error here. A review of the record indicates that it was not the intention of the trial judge to prohibit defendant from showing who actually manufactured the defective Foley catheter. Therefore, we find no error in the trial judge's denial of the motion for a new trial.

SPECIFICATION VI
The trial judge refused to reduce the jury award by one-half in accordance with Harvey v. Travelers Insurance Co., supra. The defendant hospital did not third party Travenol. The trial judge, rendering written reasons, correctly found that there are several manufacturers of Foley catheters and that the defendant hospital uses them all. He also correctly found that the evidence showed that no one could identify the particular manufacturer which made the defective catheter in this case. After reciting in his reasons his understanding of the law regarding contribution, the trial court continued, and we quote:
"Plaintiff Richard has opposed this rule on three grounds: (1) the hospital did not file a third party demand against Travenol, (2) there was no evidence of a compromise or settlement, and (3) there was no proof of negligence or liability on the part of Travenol at the trial of this case.
Based on the above observations of law, the court concludes that it was not necessary for the hospital to file a third party demand in order to protect its rights. Also, the court overlooks the technical fact that there is no evidence in the record of a compromise or settlement, because the court knows that as a matter of fact there was a settlement and release. The court concludes that the first two grounds asserted by plaintiff for why the hospital cannot claim contribution have no merit.
The third one does. The court believes that before the hospital can claim contribution, there must be proof that Travenol was, in fact, a co-tortfeasor with the hospital. My reasons for this conclusion are as follows.
All of the principles of law above enunciated apply to a situation where the released party was in fact a co-tortfeasor and thus liable in solido with other tortfeasors to the injured party. In Mullin, supra, [Mullin v. Skains, 252 La. 1009, 215 So.2d 643 (La.1968)], there was an express finding by the court of negligence on the part of the dismissed party. Minyard v. Curtis Products, Inc., La., 251 La. 624, 205 So.2d 422 (1967) says: `. . . a joint tortfeasor cannot seek contribution unless the tort-feasor against whom he seeks contribution has been cast in solido with him.' In Jones v. Louisiana Department of Highways, 338 So.2d 338 (La.App. 3rd Cir. 1976) is this language:
`The Highway Department argues in the alternative that should plaintiff, Mr. Jones, be deemed guilty of contributory negligence, the award granted to the minors against the former should be reduced by one-half, since plaintiffs (minors) released an alleged co-tortfeasor's (Jones') insurer. There has been no finding of contributory negligence on the part of Mr. Jones and thus the Department's argument is without merit. See Harvey v. Travelers Insurance Company, 163 So.2d 915 (La.App. 3rd Cir. 1964); Minyard v. Curtis Products, Inc., 251 La. 624, 205 So.2d 422 (1967).' (underscoring supplied)
Similarly, in Cunningham, supra, [Cunningham v. Hardware Mutual Casualty Company, 228 So.2d 700 (La.App. 1st Cir. 1969)], Emmons, supra, [Emmons v. Agricultural Insurance Company, 245 La. 411, *91 158 So.2d 594 (La.1963)], and in Canter v. Koehring Co., La., 283 So.2d 716 (1973), the court was either presented evidence on which to find or actually found the released party was a tortfeasor.

Harvey, supra, states that the burden of proof rests upon the party seeking contribution to establish the negligence, and consequent tortfeasor status, of the released party. This case raises but does not answer the question of what effect, if any, the plaintiff's allegation of negligence as to the released party may have on the type of proof required to establish this negligence. This question, in my opinion, although not answered by Harvey, is answered by the other cases cited above. The mere allegation of negligence by plaintiff does not establish co-tortfeasor status. It was the hospital's burden of proof here to establish the joint negligence of Travenol in order to claim a reduction of its liability based on Travenol's status as a co-tortfeasor.
Turning now to a consideration of whether the hospital has borne that proof, I repeat that the evidence at the trial indicated no one can identify the particular manufacturer. In reaching this conclusion, I am attempting as best I can to base it upon my recollection of the testimony at the trial. I was not forewarned that I would be asked to make such a finding of fact. I was not requested to submit an interrogatory on the issue to the jury. Based on information given to me in chambers conferences with the attorneys, I got the impression that the case against Travenol was weak, that the hospital's answers to interrogatories identifying Travenol were in error, that no nurse, no doctor, no records could identify Travenol as the manufacturer of this kit, and that the settlement of $5,000 paid by it was sound economics, despite the paucity of proof against it, considering the substantial damage exposure and costs of trial.
These were the considerations in the court's mind when in chambers, counsel for plaintiff sought an advance ruling from the court to prevent reference to Travenol and its settlement in the presence of the jury. I informally ordered counsel to refrain from mentioning Travenol in connection with the settlement or its prior involvement in the case, but I recall that I informed counsel for the hospital that he would be free to try to shift the blame to anyone, including the manufacturer, if he felt this would benefit his client's defense.
From all I know about the case I really believe that there is no preponderant evidence to link Travenol with this foley catheter. The hospital's brief surprisingly suggests that there may be, when it says it was prevented from making proof because of my `gag rule'. It was never my intention to prevent the hospital from presenting evidence to support its contribution demand, simply because I did not know it intended to advance such a demand. I must conclude that the evidence overwhelmingly negates the identification of Travenol as the responsible manufacturer, and I must deny the rule."
We conclude that the trial judge did not err in denying contribution.
For the above and foregoing reasons the judgment of the District Court is affirmed at appellant's costs.
AFFIRMED.
SWIFT, J., dissents and assigns written reasons.
SWIFT, Judge, dissenting.
I respectfully disagree with the majority's decision.
The only evidence offered by the plaintiff in this case to establish that the standard of care owed by a hospital to its patients required a prior testing of the Foley catheter was two editions (1964 and 1969) of a textbook entitled, "Bedside Nursing Techniques in Medicine and Surgery," which recommended testing the catheter balloon before insertion. However, it was admitted that some parts of the text were out-dated. Also, as the majority mentions, no distinction was made therein between a reusable *92 and a pre-packaged disposable catheter. To me, this is a strong indication that these books were published before the latter came into extensive use.
Ms. Lillie Himel, the operating room supervisor at Memorial, testified that the manufacturers do not recommend testing pre-packaged catheters and to her knowledge it has never been done at the hospital with a disposable Foley catheter. When the reusable type catheters were used there a number of years ago, sterilization and testing were part of the ordinary procedure. However, this was stopped when the hospital began using disposable Foley catheters.
Mrs. Margie Liechty, a licensed practical nurse employed in the three Lake Charles hospitals during 16 years, was the scrub nurse when the patch urethroplasty was performed by Dr. Melton in March, 1976. She testified that in the operating room she took orders from the doctor and she had never been instructed by a physician to test the balloon of a Foley catheter since they had been getting the pre-packaged disposable type.
Dr. Melton testified that not only does he not test these Foley catheters, but he knew of no physician that did. His testimony in this regard was corroborated by two other urologists in this community. Plaintiff has presented no evidence to the contrary or to show that the standard of care of hospitals with respect to testing individually packaged disposable Foley catheters is different. In fact, the deposition taken by plaintiff of Dr. Carlton, an eminent specialist in the field of urology, is devoid of any evidence of a standard requiring the testing of catheters by anyone prior to insertion.
Who should be better informed as to whether such testing should be done, nurses or physicians? Obviously, the latter because of their long and extensive training and experience. But in any event, it is clear this record contains no evidence that any hospital here or elsewhere tests catheters since the reusable type has been discarded.
In my opinion the facts of this case bring it within the rule of Holliday v. Peden, 359 So.2d 640 (La.App. 1 Cir. 1978), which involved a suturing needle that broke while a doctor was performing a tonsillectomy of his plaintiff. In exonerating the hospital, the court stated:
"The evidence shows that the hospital relies totally upon the manufacturer to supply defect free suturing needles. It was further shown that the needles come to the hospital in individually sealed packages which are not opened by any members of the hospital's surgical team until they are ready for use by the physician and that the hospital keeps a card file on which it is noted what preparations, instruments and supplies are requested for each type of operation. Whatever type and grade needle requested by the doctor is laid out for him. Once a needle has been used it is disposed of. Finally, it was established that the hospital has used this procedure for many years without requiring an inspection of the suturing needles by members of its surgical teams prior to their use, without incident.
"We, therefore, hold that the hospital was not guilty of negligence in handling the suturing needle prior to its use by Dr. Peden."
The majority points out that Holliday differs from the instant case in that the instrumentality causing the harm was not defective. While this is true, there is no indication in the Holliday opinion that the hospital would have been under any duty to open the individually sealed package and inspect the needle had it been defective. While the court did state that those entrusted with the care of an unconscious patient owe him a duty of furnishing defect-free instruments, it went on to say that if they fail to do so "they can be called upon to establish their non-culpability or else risk liability for injuries suffered." In other words, if a defective instrument is furnished and injury results res ipsa loquitur applies and the hospital and/or doctor are liable unless they are establish they were free from fault. Like in Holliday, this was accomplished in the present case by proof that the hospital relied totally on the manufacturer *93 to supply defect-free Foley catheters in individually sealed packages and that it is not the practice of hospitals or physicians to open them and test the catheters before use.
Furthermore, it is far from certain that had the hospital opened the sterile package and tested the catheter, the minute defect in the balloon would have been discovered. Dr. Melton testified that he would have missed the leak had he tested the balloon before insertion. He did test it, however, several days later when the catheter was removed in his office, because he wanted to know if there really was a leak. It was only after filling the balloon with twice the recommended amount of air and submerging it in water that he discovered a tiny air bubble on its surface. Dr. Logan P. Perkins, Jr., the urologist who assisted Dr. Melton in the operation, testified that overdistending the balloon in a pre-test would weaken it and there would probably be a greater risk of subsequent balloon failure than if no such test had been made.
Although I naturally sympathize with the plaintiff, in my opinion the record contains no reliable evidence that would establish negligence on the part of the hospital or its employees with regard to the handling or use of the catheter. Instead, the preponderance of evidence is clearly to the effect that the sole cause of Mr. Richard's injuries was the manufacture of the defective catheter. I am convinced that the jury's findings and conclusion in this respect were clearly wrong and they should be reversed.
Furthermore, I must also register my disagreement with the majority's decision not to give the defendants an opportunity to present evidence as to the identity of the manufacturer of the catheter and its conduct in support of their contention that the rule of Harvey v. Travelers Insurance Company, 163 So.2d 915 (La.App. 3 Cir. 1964) is applicable in this case.
For these reasons, I respectfully dissent.
NOTES
[1] A "patch urethroplasty" is an operation to correct a urethral stricture. As explained by Doctor Melton, non-hair bearing skin is cut from the foreskin of the penis or the brachial plexus up in the neck, the skin is de-fatted, the mucosa strained, a "sound" is inserted, and then using sharp dissection the urethra is exposed. Then the scar tissue is cut out, and the non-hair bearing skin is sutured to replace the destroyed tissue.
[2] This type catheter is named after its inventor.
[3] The Johannsen urethroplasty was utilized to correct the strictures in plaintiff's urethral canal. On the first operation of September 21, 1976, an incision through the skin of the undersurface of the penis was made, carrying it down into the tip of the urethra, and split the urethra from the normal tissue from beyond the stricture to the normal tissue behind the stricture, and the skin margin was sewn down to the tube that had been split open. The incision is from the tip of the place where it joins into the scrotum. It is a longitudinal incision. The goal of the first operation was to sew skin onto the urethra that could subsequently be used on the second operation to rebuild the urethra. Concerning the second operation on January 17, 1977, Doctor Carlton stated: "We used the skin we had sewn to the urethra in the first operation to rebuild the tube and roll the skin up into a tube so he then had a new urethra from all the way from the tip of the penis back to the scrotum, and we put a catheter into the bladder to drain the urine."
[4] The fact that doctors do not pre-test these catheters is not crucial to a finding of negligence on the part of the defendant-hospital. If there is any duty to pre-test the catheter, it would be with the hospital and not with the doctors. The hospital, and not the doctors, was providing the catheters.