478 So.2d 1379 (1985)
Larry FONTENOT, Plaintiff-Appellee,
v.
F. HOLLIER & SONS, et al., Defendants-Appellants.
No. 85-288.
Court of Appeal of Louisiana, Third Circuit.
November 27, 1985.
Writ Granted January 31, 1986.
*1380 Edwards, Stefanski & Barousse, James M. Cunningham, III, Crowley, Davidson, Meaux, Sonnier & McElligott, Richard Meaux, Lafayette, for defendants-appellants.
John Haas Weinstein, Opelousas, for plaintiff-appellee.
Before DOMENGEAUX, DOUCET and KING, JJ.
KING, Judge.
This appeal presents the issue of whether a grain drill manufactured by defendant, John Deere Company and Deere & Company, and sold by defendant, F. Hollier & Sons, Incorporated, to plaintiff, Larry Fontenot, is defective.
After trial, the jury found the grain drill defective and awarded judgment in favor of the plaintiff and against defendants for damages and attorney's fees. The defendants timely appeal. We affirm.

FACTS
Larry Fontenot (hereinafter Fontenot) purchased a John Deere 8300 grain drill with a Tru-Vee attachment, manufactured by John Deere Company and Deere & Company (hereinafter Deere), from F. Hollier & Sons, Incorporated (hereinafter Hollier), a Deere franchised dealer, so that he could plant soybean crops for himself and Arlen Lafleur (hereinafter Lafleur). Neither Fontenot's nor Lafleur's crop succeeded as expected and Fontenot filed suit against Deere and Hollier, alleging that the grain drill was defective and that the defect caused his low crop yield and resultant damages.
Lafleur also filed a separate suit against John Deere Company and Deere & Company *1381 to recover his damages allegedly caused by the defective grain drill. Fontenot's case was consolidated for trial with that suit, entitled Arlen Lafleur v. John Deere Company, et al., and bearing Number 83,620 on the trial court docket. Judgment was rendered in favor of Lafleur and against Deere in that suit and Deere appealed. These suits remain consolidated on appeal and, since the law and relevant facts are common to both, our opinion here is equally applicable. However, we render a separate judgment in the consolidated case of Arlen Lafleur v. John Deere Company, et al., 478 So.2d 1390 (La.App. 3rd Cir. 1985).
A jury decided Fontenot's case and the trial judge decided Lafleur's case at the time of the trial. Both the judge and the jury found that the John Deere 8300 grain drill with a Tru-Vee attachment was defective and that the defect caused Fontenot's and Lafleur's crop loss and damages. After considering the testimony and other evidence produced at trial the jury awarded Fontenot the following items of damages:

Return of purchase price $ 6,178.00
Expenses incurred 15,678.75
Crop loss 60,820.00
Mental anguish 125,000.00
Attorney's fees 69,225.00
 ___________
Total $276,901.75

The trial judge awarded Lafleur the following sums as damages:

Crop loss $ 55,388.03
Mental anguish,
aggravation, stress and
inconvenience 10,000.00
 ___________
Total $ 65,388.03

In Fontenot's suit, Deere and Hollier filed Motions for Judgment Notwithstanding The Verdict and/or New Trial or Alternatively For Remittitur from the judgment awarded Fontenot. The trial court denied their motions.
Deere and Hollier then appealed these consolidated cases asserting numerous specifications of error which can be broadly stated as follows:
The triers of fact erred in (1) holding that the grain drill was defective and the sole proximate cause of Fontenot's and Lafleur's damages; and the trial court erred in (2) refusing to invoke the express warranty provisions of the sale; (3) failing to reduce the jury's award of $125,000.00 in damages for mental anguish suffered by Fontenot; (4) awarding damages for economic loss to Lafleur; (5) admitting evidence of subsequent remedial measures and a video tape demonstrating the grain drill's operation; (6) refusing to allow defendants to introduce evidence on the issue of "credit for use;" and (7) failing to reduce the jury's award to Fontenot of $69,225.00 in attorney's fees.
For fifteen years prior to 1980, Fontenot worked as a laborer on Lafleur's farm. In 1980, Fontenot decided to start his own farm business on a 432 acre tract of land in Evangeline Parish and St. Landry Parish. In order to complete his 1980 soybean crop, Fontenot used $4,000.00 of his own money together with $71,000.00 that he borrowed from the F.H.A. and $6,000.00 that he borrowed from Lafleur. At that time Fontenot also entered into an agreement with Lafleur by which he agreed to plant and harvest Lafleur's 402 acres of soybeans in exchange for the use of Lafleur's farming equipment and bookkeeping system.
To facilitate the planting of both crops, Fontenot purchased a John Deere 8300 grain drill with a Tru-Vee attachment, manufactured by Deere, from Hollier on April 8, 1980 for a purchase price of $6,178.00.
One of the main selling features of the John Deere 8300 grain drill was that it is designed to accurately plant seeds at any depth selected by the farmer. The operation of the grain drill may be briefly explained as follows: The grain drill has a drill path with 16 runners which each plants one row of seeds. On each runner there is a disc blade which cuts into the soil to a pre-set depth and the seeds are dropped into the resulting trench. The depth of the trench is governed by a gauge wheel on each runner which controls the depth to which the disc blade cuts. The pressure of the disc cutting into the soil forces the gauge wheel on each runner all *1382 the way up to a stop at a pre-set position. As long as each gauge wheel reaches the pre-set stop position, the seeds will be planted accurately at the pre-set depth chosen by the farmer. However, if the force of the disc cutting into the soil does not force the gauge wheel up to the pre-set stop position, the disc blade will not cut deeply enough into the soil resulting in the seeds being planted shallower than the preset depth. Once the seeds have been dropped into the trench made by the disc blade, a "packing wheel" spreads dirt over the seeds so that they are adequately covered.
On May 22, 1980, Fontenot started planting the soybean seeds with the John Deere grain drill set at a depth of 1½ to 1¾ inches, which is the customary depth for planting soybeans. After planting only 40 or 60 yards, he stopped so that he and Lafleur could check every runner. The grain drill was planting at the proper depth so he proceeded with the planting. Lafleur then decided to ride on the tractor with Fontenot so that he could watch the drill plant while Fontenot was driving. They planted another 40 or 50 yards and stopped again to check the drill and found that all the runners were planting properly. They then planted another round and a half of the field, and they again stopped and checked the grain drill's seed placement. Fontenot and Lafleur thought the grain drill was working properly so Fontenot resumed planting. He planted 10 or 12 acres before he stopped to check the grain drill again. He checked several of the runners at this time and everything appeared fine. Since the grain drill seemed to be working properly, Fontenot thought it was only necessary to check it every 10 to 20 acres which he did and it appeared to be working properly.
Fontenot had planted approximately 220 acres when he became ill on June 1, 1980 and was forced to stop planting. As a result, Lafleur began planting the remaining 614 acres on June 4, 1980. Lafleur testified that he randomly checked several runners every 80 to 100 acres and the grain drill seemed to be working properly. Before Lafleur finished planting the remaining acreage, Fontenot recovered from his illness. To insure that they would finish all of the planting within the prime time planting period, Fontenot and Lafleur borrowed an International Harvester planter from a friend and used both planters to complete their planting. On June 10, 1980, they finished planting the entire crop on all of their acreage.
Sometime during the second week of June, Lafleur was cleaning the grain drill when he noticed that some of the gauge wheels which govern the planting depth were hard to move up and down. He found that the gauge wheels on only 2 or 3 runners in the drill path of 16 runners moved up easily. He thought they should move more freely on the rest of the runners so he checked the fields and found seeds lying only ½ inch deep in the fields planted with the John Deere grain drill. Lafleur showed this to Fontenot and they called a salesman at Hollier's, Ralph Miller.
Miller inspected the fields and told them to wait a few days because if it rained their crop would come up anyway. One week and a half later it did rain, however, most of the crop still did not come up. At Hollier's request, Deere's factory representative, Steve Hines, made a trip to Fontenot's farm to inspect the John Deere grain drill. He torqued the castellated nuts on the John Deere grain drill that govern the movement of the gauge wheels to 120 pounds and the gauge wheels would not move as freely as he wanted. Miller told Hines that one of Hollier's employees could adjust the grain drill to make it work correctly. The next day Miller sent Hollier's assembly man, Herb Hazelton, to adjust the John Deere grain drill. Hazelton loosened the castellated nuts, which were torqued at 120 pounds in accordance with the owner's manual, on each of the runners until he could move each gauge wheel freely by hand.
In the meantime the soybean crop was not growing as one would normally expect. Photographs introduced into evidence showed some rows were growing at an acceptable rate while other rows directly *1383 adjacent to the healthy rows were barely growing, if at all. The F.H.A. county supervisor, Russell Gibson, examined the field sometime during June and he testified that the fields had "skip areas" just as were shown in the photographs. Gibson testified that the fields were striped with healthy rows and poor rows growing side by side. He estimated that 50% of the rows had no plants on them when he toured the fields.
After Fontenot harvested the disappointing soybean crop he had his crop and Lafleur's crop weighed separately. Lafleur's tracts produced an average of 6.33 bushels per acre and Fontenot's tracts produced an average of 7.75 bushels per acre. The parish average for 1980 was 26.7 bushels per acre. The disappointing crop yield led both Lafleur and Fontenot to file their suits alleging that the John Deere grain drill was defective and that the defect caused them damage.

DEFECTIVE PRODUCT AND LOSS
Deere and Hollier contend that the triers of fact erred in finding that the grain drill was defective and that the defect was the sole cause of both Fontenot's and Lafleur's poor crops. In products liability cases, a plaintiff must prove the product has a defect, that the defect caused his injuries, and that the product was in normal or foreseeable use at the time it caused his injuries. Oatis v. Catalytic, Inc., 433 So.2d 328 (La.App. 3rd Cir.1983), writ den., 441 So.2d 210 (La.1983). The word "defect" in products liability litigation means that the product is unreasonably dangerous, that is, it presents an unreasonable risk of injury. DeBattista v. Argonaut-Southwest Ins. Co., 403 So.2d 26 (La.1981), cert. den., 459 U.S. 836, 103 S.Ct. 82, 74 L.Ed.2d 78 (1982).
Fontenot and Lafleur allege that the grain drill was defective because the castellated nuts governing the freedom of the gauge wheels to move up and down to control the depth at which seeds are planted were overtorqued at the manufacturer's recommended torque of 100 to 120 pounds. They contend that the excessive torque of these nuts prevented the gauge wheels from moving freely enough to reach the upper pre-set stop positions and this caused the grain drill to plant the seeds at a depth shallower than the 1½ to 1¾ inch pre-set depth that they had selected. In order to prove that the over-torqued castellated nuts caused the shallow planting as opposed to any fault in the planting attributable to them, Fontenot and Lafleur hired Dr. Thomas Mayer, a Phd. in Agricultural Engineering, to test the John Deere grain drill. Dr. Mayer loosened the torque on the eight castellated nuts on the gauge wheels on the right side of the grain drill and torqued the castellated nuts on the other eight gauge wheels on the left side of the grain drill at 120 pounds. He then ran the drill over a test tract of light soil similar to that planted by Fontenot and Lafleur. The right gauge wheels that were loosened on the right runners moved all the way up to the pre-set stops and consequently planted all the seeds properly at the pre-selected depth. However, the left gauge wheels on the left runners, where the castellated nuts were torqued at 120 pounds, did not move all the way up to the pre-set stop positions. As a result, these gauge wheels caused the seeds to be planted at various shallow depths, including a few that were planted just slightly below the surface.
Perhaps the strongest proof that the grain drill was defective is the testimony of Deere's own Agricultural Engineer, Steve Junge. Junge admitted that sometime during August or September of 1979 (more than eight months prior to the date Fontenot purchased the drill) Deere decided to change the torque on the castellated nuts on the John Deere 8300 grain drill to 60 to 80 pounds instead of the 100 to 120 pounds torque recommended in the operator's manual issued to Fontenot. He further admitted that the 100 to 120 pound recommended torque in Fontenot's operator's manual was incorrect and that the manual should have reflected the change in torque Deere had decided was correct. Two months after Fontenot's grain drill was delivered, Deere issued a service bulletin which states that the "[T]orque specifications for nut on pivot *1384 bolt is incorrect in technical manual, operator's manual and pre-delivery instructions." Finally, in August 1980, Deere issued a new owner's manual reflecting the change in recommended torque on the castellated nuts to 60 to 80 pounds.
Not only did Fontenot and Lafleur prove by a preponderance of the evidence that the John Deere grain drill was defective, they also persuasively proved that the grain drill was the cause of their disastrous crop yield. Fontenot and Lafleur introduced into evidence the weight tickets representing the yield they produced from a tract of land they planted with the John Deere grain drill as opposed to the yield produced on an adjacent tract planted with the International Harvester grain drill. Both tracts were prepared exactly the same, planted on the same day and generally contained the same type soil. The tract planted with the John Deere grain drill only produced 11.65 bushels per acre whereas the tract planted with the International Harvester grain drill yielded 33.7 bushels per acre. Dr. Richard Jensen, an expert in soybean production, testified for plaintiffs that, assuming everything else was the same, one must conclude that the radical difference in yields was caused by the John Deere grain drill used to plant the seeds. We find the evidence of the vast difference in yields on these two tracts particularly persuasive in light of the fact that they were not originally planted as a test to prove that the John Deere grain drill was defective. As noted above, the only reason that the International Harvester grain drill was used at all was to ensure that Lafleur and Fontenot would complete their planting before the prime time planting deadline. It was only after the crops were planted and obviously not growing properly that Fontenot and Lafleur decided to weigh these two tracts' yields separately for purposes of comparison.
Defendants contend that the John Deere grain drill is not defective and that the cause of Fontenot's and Lafleur's low crop yield was poor farming practices and bad weather conditions. However, if poor farming and bad weather conditions were the cause of plaintiffs' low yield, there should be no vast difference in the crop yield between the tract planted with the John Deere grain drill and the adjacent tract planted with the International Harvester grain drill. Lafleur introduced records showing that during the last five year period that he planted soybeans on these same tracts of land and these tracts of land produced an average yearly yield of 29 bushels per acre whereas the parish average was only 26.7 bushels per acre. Lafleur and Fontenot testified that they used the same methods to prepare the tracts for planting the 1980 crop as they always have in the past.
Hollier and Deere attempted to prove that the John Deere grain drill was not defective and that the cause of plaintiffs' disastrous crop was late planting and bad weather conditions through the testimony of an expert, David Black. Black was accepted by the court as an expert in weather as it relates to crops and agronomy. He testified that in 1980, the rainfall for the area of both plaintiffs' lands was only 50% of the yearly average rainfall. He also testified that Fontenot and Lafleur should have planted before May 15, 1980. He testified from experience that every one percent drop in rainfall results in a drop of 8/10 of a percent of crop yield. Using this figure, a variable for late planting, and considering the type soil on the tracts in question, he estimated that the best yields Fontenot and Lafleur could have achieved were 12 or 13 bushels per acre on the first 200 acres planted and 7 or 9 bushels on the remaining 600 acres planted.
However, if late planting and bad weather were the cause of plaintiffs' low yield, there should have been no vast difference in yield between the tract planted with the John Deere grain drill and the tract planted with the International Harvester grain drill. Furthermore, Black admitted that he did not view all of plaintiffs' fields nor did he obtain soil samples, yet he considered the soil type for all fields to be the same to formulate his estimate.
Findings of fact made by the trier of fact are entitled to great weight and will not be *1385 disturbed on appeal absent a clear abuse of discretion. Arceneaux v. Domingue, 365 So.2d 1330 (La.1978); Canter v. Koehring Company, 283 So.2d 716 (La.1973).
After a review of the record, we do not find the trial judge and jury were manifestly in error in finding that the John Deere grain drill was defective and that this defect was the sole cause of plaintiffs' disastrous crop.

KNOWLEDGE OF THE DEFECT
Deere had full knowledge of the defect in its John Deere 8300 grain drill with the Tru-Vee attachment prior to the time of its sale to Fontenot, as previously set forth above, which was fully testified to by Steve Junge, its Agricultural Engineer.
Hollier contends that there is no evidence to support the trier of fact's finding that it knew of any defect prior to the sale of the John Deere grain drill to Fontenot. Hollier claims that, as a good faith seller, the most it could be liable for is the return of the purchase price. A review of the entire record convinces this court that there is sufficient evidence to support the finding of fact that Hollier knew of the defect in the John Deere grain drill at the time of its sale to Fontenot.
The evidence shows that in 1979 Hollier sold a John Deere 8300 grain drill with a Tru-Vee attachment, just like Fontenot's, to a local farmer, Bobby Foret. While using the grain drill, Foret discovered that the grain drill was not planting properly so he loosened the castellated nuts. This allowed the gauge wheels to move freely and plant accurately; however, it caused premature wear. He reported this to Hollier and they replaced the worn parts free of charge. J.W. Powell, Hollier's Vice-President, admitted that he was aware that Foret's drill wore out due to the fact that he loosened the castellated nuts to make it plant properly.
Hollier's assembly man, Herb Hazelton, testified that sometime before Fontenot purchased his John Deere grain drill, Hazelton was sent to the farm of another local farmer named Fuselier to check his John Deere grain drill. Fuselier's grain drill was planting too shallow due to powdery soil. Hazelton re-torqued the nuts to make it plant properly but he could not remember whether he loosened it or tightened it. Powell also admitted that he knew the John Deere grain drill would not plant accurately in powdery soil, yet Fontenot was never warned of this problem.
Finally, when Deere's factory man, Steve Hines, inspected Fontenot's John Deere grain drill at Fontenot's and Lafleur's request he could not get the gauge wheels to function properly after torquing the castellated nuts on them to 120 pounds. Hollier's salesman, Ralph Miller, told Hines that he "had a repairman at the shop that said you can make it work." The next day, Hazelton went out to Fontenot's farm and loosened the castellated nuts until all the gauge wheels moved freely.
This evidence, taken as a whole, sufficiently supports the finding of the trier of fact that Hollier knew prior to the time of the sale of the John Deere grain drill to Fontenot that the 120 pound torque of the castellated nuts on the gauge wheels rendered the drill defective. For these reasons we can not say the triers of fact were manifestly in error in finding that Deere and Hollier were aware of the defects in the John Deere grain drill and were not in good faith at the time of the sale of the John Deere grain drill to Fontenot.

APPLICABILITY OF WARRANTY LIMITATIONS
Deere and Hollier contend that Fontenot contractually agreed that they would not be liable for incidental or consequential damages including, but not limited to, loss of crops, loss of profits, rental of substitute equipment or other commercial loss by the terms of the contract of sale which he signed when he purchased the John Deere grain drill from Hollier. Paragraph G, Remedies Exclusive, on the back of the contract of sale, was made a part of the contract and does contain such language. Similar provisions have been held to not be contrary to public policy where the warranty implied by law is excluded by the contract *1386 of sale itself. See A.A. Gilbert Pipe & Supply Company v. Cassard, 240 La. 180, 121 So.2d 736 (1960); California Chemical Company v. Lovett, 204 So.2d 633 (La.App. 3rd Cir.1967); Von Zonneveld Bros. & Philippo, Inc. v. Cary, 86 So.2d 252 (La.App. 1st Cir.1956); Gilbert v. Reuter Seed Company, 80 So.2d 567 (La.App. Orl.Cir.1955), rehearing den.; and Landreth Seed Co. v. Kerlec Seed Co., 12 La.App. 506, 126 So. 460 (La.App.Orl.Cir. 1930). For such waivers to be effective they must be written in clear and unambiguous terms, must be contained in the sale and chattel mortgage documents, and must be brought to the attention of the buyer and explained to him. Edwards v. Port AMC/Jeep, Inc., 337 So.2d 276 (La.App. 2nd Cir.1976), writ den., 339 So.2d 854 (La. 1976); Hendricks v. Horseless Carriage, Inc., 332 So.2d 892 (La.App. 2nd Cir. 1976). The evidence showed that Fontenot was poorly educated and that there was no evidence that the defendants or their representatives called this provision of the contract to Fontenot's attention or explained it to him at the time of the sale of the John Deere grain drill. For this reason we do not find the trial court was manifestly in error in refusing to apply the waiver of remedies provision of the contract of sale.

DAMAGES TO FONTENOT
The jury awarded $125,000.00 for other damages including mental anguish. Hollier and Deere argue that this was error because (1) Fontenot did not receive bodily injury, and (2) normally non-pecuniary damages are not ordinarily awarded in contract or redhibition cases citing LSA-C.C. Art. 2520 and Meador v. Toyota of Jefferson, Inc., 332 So.2d 433 (La.1976). We disagree with both contentions.
This court has already recognized that a plaintiff who suffers no bodily injury may still recover damages for mental anguish when his property is damaged. Carroll v. State Farm Ins. Co., 427 So.2d 24 (La.App. 3rd Cir.1983). A review of recent jurisprudence reveals that the Meador rule is no longer inflexibly applied to preclude awards of non-pecuniary damages. In Gele v. Markey, 387 So.2d 1162 (La.1980), the Supreme Court recognized that the inflexible rule of Meador may work injustice in cases where the obligee of a contract suffers real, substantial emotional distress as a result of one party's breach of contractual obligations. The court also recognized that:
"Elements of contract and tort are sometimes so intertwined that cases cannot be easily labelled one or the other." Gele v. Markey, 387 So.2d 1162, at page 1163 (La.1980).
See also, Franklin v. Able Moving & Storage Co., Inc., 439 So.2d 489 (La.App. 1st Cir.1983). We note that this is particularly true in a redhibition-products liability case. An inflexible application of the Meador rule in this case would lead to an illogical and unjust result. Fontenot, who purchased the John Deere grain drill and eventually lost his farm due to his disastrous 1980 crop, would be denied damages for his mental anguish because his products liability action is intertwined with a redhibition action. On the other hand, Lafleur, who is characterized as a user of the drill, would be entitled to mental anguish because his cause of action is based solely in tort.
In Pike v. Stephens Imports, Inc., 448 So.2d 738 (La.App. 4th Cir.1984), the Fourth Circuit reinterpreted Meador in light of Gele and held that:
"[a] plaintiff, upon sufficient proof, may recover damages for inconvenience, loss of use, aggravation, delay and mental anguish for negligent breach of a repair contract, irrespective of the intellectual or physical nature of the contract's principal object." Pike v. Stephens Imports, Inc., 448 So.2d 738, at page 743 (La.App. 4th Cir.1984).
See also, Ducote v. Arnold, 416 So.2d 180 (La.App. 4th Cir.1982), writ den., 421 So.2d 238 (La.1982).
In Philippe v. Browning Arms Co., 395 So.2d 310 (La.1980), the purchaser of a defective shotgun sued the manufacturer for the injuries he received when the gun misfired and injured his thumb. The Louisiana Supreme Court applied the fountainhead of tort responsibility of LSA-C.C. Articles *1387 2315 and 2316, together with the sales articles LSA-C.C. Articles 2520, et seq., and awarded both non-pecuniary damages, traditionally allowed in tort, and attorney's fees, traditionally allowed in redhibition/contract action. The Supreme Court noted:
"There is no compelling reason to require a person injured by a defective product he has purchased to proceed either in contract or in tort. The seller's (manufacturer's) act of delivering a defective thing, when he knows of the defect, gives rise to delictual, as well as contractual, liability. S. Letvenoff [sic], Louisiana Civil Law Treatise-Obligations, Book 2 § 252 (1975); see also W. Crawford, Products Liability The Cause of Action, 22 La.B.J. 239 (Mar. 1975)." Philippe v. Browning Arms Co., 395 So.2d 310, at page 319 (La.1980).
Our brethren on the First Circuit Court of Appeal have recently had the opportunity to interpret Philippe v. Browning Arms Co., in light of Meador, Gele and Pike. That court stated:

"Philippe v. Browning Arms Co., supra, in our opinion, is authority for the proposition that the purchaser who sustains damages because he or she purchased a redhibitorily defective product is entitled to be compensated for all provable damages, including inconvenience and mental anguish, if the causation link is established. Philippe, supra, mandates judicial repudiation of the blanket exclusion of damages for inconvenience and mental anguish in redhibition and quanti minoris actions. To knowingly sell a redhibitorily defective product, such knowledge being imputed to a manufacturer, is to do a tortious act. It is well settled that a tortfeasor's victim who sustains mental anguish as a result of the action or inaction of the tortfeasor is entitled to be compensated for it." Bourne v. Rein Chrysler-Plymouth, Inc., 463 So.2d 1356, at page 1360 (La. App. 1st Cir.1984), writ den., 468 So.2d 570 (La.1985).
We adopt the Bourne interpretation of Philippe v. Browning Arms Co., supra, and hold that the trier of fact was correct in awarding Fontenot non-pecuniary damages including mental anguish.
Hollier and Deere argue alternatively that the jury's award of $125,000.00 to Fontenot for mental anguish and other damages is excessive and should be reduced. This crop was the first crop Fontenot planted for himself as an independent farmer. He was forced to watch helplessly for months as his crops did not properly grow. He had borrowed over $84,000.00 to start the planting and harvesting of his first crop and due to the disastrous results he was unable to meet his payments on his loan. He had never owed that much money in his life and he had never before been unable to pay his debts. The entire situation caused him great worry. F.H.A. financed him for one more year after which he was unable to get re-financed and he ultimately lost his farming business which was his first business venture.
It is well settled that a trier of fact's damage award will not be disturbed absent a clear abuse of discretion. Reck v. Stevens, 373 So.2d 498 (La.1979). In light of the particular facts of this case, we cannot say that the jury abused its discretion in awarding $125,000.00 to Fontenot for "other damages including mental anguish" or that the trial court was manifestly in error in refusing to reduce this damage award.

DAMAGES TO LAFLEUR
Deere argues that the trial court erred in awarding $55,388.03 to Lafleur in damages for crop loss since this is essentially an award for economic loss. Deere contends that damages incurred as a result of economic losses arising out of commercial transactions are not recoverable unless there results a personal injury or damage to other property. We disagree. This court has approved an award of damages for lost profit, i.e. economic loss, in a commercial lease case where there was no bodily injury or damage to other property. In John Deere Indus. v. Willett Timber Co., 380 So.2d 182 (La.App. 3rd Cir.1980), writ den., 381 So.2d 1234 (La.1980), we held that the lessee of a defective John Deere Wheel *1388 Loader was entitled to damages for the profits he lost because the defective wheel loader prevented him from filling all of his orders for wood chips.
Even assuming the correctness of Deere's assertion that damages for economic losses are not recoverable in cases arising out of a commercial transaction unless there results personal injury or damages to other property, Lafleur is still entitled to damages for his crop loss. Lafleur's crop loss did not result from a commercial transaction. He was not the purchaser of the John Deere grain drill; he was a user of the grain drill and as such his cause of action is based purely in tort. Contrary to Deere's contentions, this case does involve damage to property. Lafleur's crop was damaged by the defective John Deere grain drill and his crops were his property. See LSA-C.C. Art. 463. For this reason we find that Lafleur was entitled to damages from Deere for the loss of his crop and the trial court was not clearly wrong in making this award of damages.

ADMISSION OF REMEDIAL MEASURES AND VIDEO TAPE DEMONSTRATION
Defendants argue that the trial court violated the well-established evidentiary rule against admitting evidence of remedial measures by admitting into evidence a service information bulletin issued in July, 1980 and an operator's manual dated August, 1980. See Thibodeaux v. Carlock, 392 So.2d 1084 (La.App. 3rd Cir. 1980). Both documents were issued after Fontenot purchased the John Deere grain drill. The service bulletin states that the 100 to 120 pound torque originally recommended for the castellated nuts is incorrect and that the nuts should be torqued to 60 to 80 pounds. Likewise, the August, 1980 operator's manual reflects the same recommended change in torque.
The rationale for the rule against allowing evidence of after-the-fact remedial measures is twofold. First, as a matter of policy, the courts want to encourage alleged tortfeasors to take precautions to prevent the reoccurrence of a similar injury. Lea v. Baumann Surgical Supplies, Inc., 321 So.2d 844 (La.App. 1st Cir.1975), writ den., 325 So.2d 279 (La.1976). Obviously, if courts admit evidence of remedial measures as proof of the defect then manufacturers and sellers will be hesitant to take measures to make the product safer for fear that the trier of fact will consider this an admission that the product is originally defective. Second, evidence of postaccident improvements to a product is not relevant as it has no probative value on the issue of whether the product was defective at the time of the sale or at the time of the injury. Lovell v. Earl Grissmer Co., Inc., 422 So.2d 1344 (La.App. 1st Cir.1982), writ den., 427 So.2d 871 (La.1983).
Normally, evidence of post-injury corrections, such as the service information bulletin and the operator's manual would be inadmissible. However, we find that under the facts of this case, their admission was not erroneous. Cf. Landry v. Adam, 282 So.2d 590 (La.App. 4th Cir.1973). As mentioned earlier, Deere's own engineer, Steve Junge, testified that Deere decided to change the torque of the nuts to 60 to 80 pounds in September or August, 1979 (at least eight months prior to Fontenot's purchase of the John Deere grain drill).
Junge even admitted that at the time Fontenot purchased the John Deere grain drill, Deere had determined that the proper torque was 60 to 80 pounds even though Fontenot's operator's manual recommended 100 to 120 pounds. Thus, neither the service information bulletin nor the operator's manual are evidence of post-sale or post-injury modifications. They merely reflect Deere's decision to change the torque pressure on the castellated nuts prior to the time Fontenot bought the grain drill and are evidence to corroborate that Fontenot was not properly warned.
Defendants also contend that the trial judge erred in allowing plaintiffs to play a video tape to the jury and trial court showing Dr. Maher torquing the castellated nuts and how this affected the operation of the John Deere grain drill. We need not consider whether the video tape was objectionable because counsel for defendants *1389 failed to timely object to the showing of the tape at trial. Counsel's failure to object constitutes a waiver of the right to object and he cannot now urge the objection on appeal. Richard v. Southwest Louisiana Hospital Ass'n, 383 So.2d 83 (La.App. 3rd Cir.1980), writ den., 385 So.2d 274 (La. 1980). The only objection Hollier's and Deere's counsel raised at trial was to the audio portion of the tape. The record reflects that the trial judge sustained the objection and the sound was turned off. For these reasons we find that the trial court was not manifestly in error in making these evidentiary rulings.

CREDIT FOR USE
Deere and Hollier contend that the trial court committed error in not allowing them to present evidence to obtain credit for plaintiffs' use of the John Deere grain drill against the amounts of the damages awarded to Fontenot and Lafleur. Neither defendant affirmatively pled a credit for use and the first time the issue of credit for use was raised was during the trial. When defendants tried to present evidence on this issue the trial court sustained the objections of Fontenot and Lafleur. Deere and Hollier contend that credit for use is not an affirmative defense, citing Smith v. Max Thieme Chevrolet Company, 315 So.2d 82 (La.App. 2nd Cir. 1975), and that they should have been allowed to present evidence on this issue. Other Louisiana courts have held the defense of credit for use is an affirmative defense and failure to specifically plead it constitutes a waiver of the defense. See Waite v. Tomeny River Road Estates, Inc., 367 So.2d 70 (La.App. 4th Cir.1979), writ den., 368 So.2d 136 (La.1979). We find that the refusal of the trial court to allow evidence of credit for use for failure to plead it as an affirmative defense was not error. However even if Deere and Hollier had been permitted to present evidence on the issue of credit for use they, because of being found in bad faith, are not entitled to such credit. LSA-C.C. Art. 2531; White v. Martin GMC Trucks, Inc., 359 So.2d 1094 (La.App. 3rd Cir.1978), writ den., 367 So.2d 391 (La.1978). As both Deere, as the manufacturer, and Hollier, as the seller, were found to have knowledge of the defect in the John Deere grain drill before it was sold to Fontenot they are not entitled to credit for Fontenot's and Lafleur's use of the John Deere grain drill as they were not in "good faith." For this reason we do not find the trial court's ruling in refusing to permit evidence on the issue of credit for use was error.

ATTORNEY'S FEES
Hollier and Deere contend that the jury's award of $69,225.00 for attorney's fees to Fontenot is unreasonable and should be reduced on appeal. They claim that the award is unreasonable because it is based on the one-third contingency fee contract that Fontenot entered into with his counsel. We disagree. The amount a court awards for attorney's fees may be based on the litigant's contingency fee contract with his attorney where the resulting amount is reasonable. Pillow v. Board of Com'rs, 425 So.2d 1267 (La.App. 2nd Cir. 1982), writ den., 445 So.2d 1225 (La.1984). In determining what is a reasonable amount for statutorily imposed attorney's fees in a redhibition case, the following factors have been determined by the courts to be relevant:
"(1) The responsibility incurred
(2) The extent and nature of the work performed
(3) The legal know how and skill of counsel. Sokol v. Bob McKinnon Chevrolet, 307 So.2d 404 (La.App. 4th Cir.1975)." Anselmo v. Chrysler Corp., 414 So.2d 872, at page 875 (La.App. 4th Cir.1982).
The trier of fact is afforded great discretion in determining what amount constitutes reasonable attorney's fees. White v. Martin GMC Trucks, Inc., supra. While the trier of fact must consider the factors listed above, these factors do not limit the trier of fact's discretion. Dowden v. Commonwealth Life Ins. Co., 407 So.2d 1355 (La.App. 3rd Cir.1981). We note that the purpose of awarding attorney's fees and expenses under LSA-C.C. Art. 2545 in redhibition *1390 cases is "to restore the purchaser, as much as possible, to the condition he enjoyed prior to the sale." Alexander v. Burroughs Corp., 359 So.2d 607 (La.1978); Cox v. Moore, 367 So.2d 424, at page 426 (La.App. 2nd Cir.1979), writ den., 369 So.2d 1364 (La.1979). Thus, we hold that the trial court did not abuse its discretion in awarding $69,225.00 for attorney's fees.
For the foregoing reasons, the judgment appealed from is hereby affirmed. Costs of this appeal are to be paid by defendants-appellants.
AFFIRMED.
DOMENGEAUX, J., concurs and assigns brief reasons.
DOMENGEAUX, Judge, concurring.
I agree with Judge King's excellent opinion, and concur merely to reiterate my long and consistent position that there should be no distinction made between contract and tort cases when it comes to the assessment of nonpecuniary damages. See Martin v. AAA Brick Co., Inc., 386 So.2d 987 (La. App. 3rd Cir.1980), concurring opinion; Elliott v. Louisiana Intrastate Gas Corp., 390 So.2d 571 (La.App. 3rd Cir.1980), footnotes 2 and 3; Derouen Electrical Service v. Robert M. McKay, et al, 406 So.2d 734 (La.App. 3rd Cir.1981), concurring opinion; Leach v. Freeman, 395 So.2d 440 (La.App. 3rd Cir.1981), concurring opinion; and Caubarreaux v. Hines, et al, 442 So.2d 898 (La.App. 3rd Cir.1983), footnote 4.