491 So.2d 624 (1986)
Arlen LAFLEUR
v.
JOHN DEERE COMPANY, et al.
Larry FONTENOT
v.
F. HOLLIER & SONS, INC., et al.
No. 85-C-2402.
Supreme Court of Louisiana.
June 23, 1986.
Rehearing Denied September 4, 1986.
*625 James M. Cunningham, III, Edwards, Stefanski, & Barousse, Crowley, Richard C. Meaux, Davidson, Meaux, Sonnier & McElligott, Lafayette, for defendant-applicant.
John Haas Weinstein, Losavio & Weinstein, Baton Rouge, for plaintiff-respondent.
CALOGERO, Justice.[*]
Plaintiff Larry Fontenot purchased a farming implement (a grain drill) to use in planting a soy bean crop. Because it was defective his crop was disastrously poor and he suffered pecuniary as well as nonpecuniary damages.
The principal question for us to decide now is whether the $125,000 portion of his $276,901.75 jury award for mental anguish should be permitted to stand. For the reasons which follow we decide that it should not.
Fontenot purchased the John Deere 8300 grain drill manufactured by John Deere Company and Deere & Company (hereinafter referred to as Deere), from F. Hollier & Sons, Incorporated (hereinafter referred to as Hollier), a Deere franchised dealer, so that he could plant soybean crops for himself and Arlen Lafleur. Neither Fontenot's nor Lafleur's crop succeeded as expected and Fontenot filed suit against Deere and Hollier, alleging that the grain drill was defective and that the defect caused his low crop yield and resulting damages.
Lafleur also filed a separate suit against Deere to recover his damages allegedly caused by the defective grain drill. Fontenot's lawsuit was consolidated for a single trial with Lafleur's.
A jury decided Fontenot's case and the trial judge decided Lafleur's. Both the judge and the jury found that the John Deere 8300 grain drill with a Tru-Vee attachment was defective and that the defect caused Fontenot's and Lafleur's crop losses and damages. After considering the testimony and other evidence produced at trial the jury awarded Fontenot the following items of damages against Hollier and Deere:

Return of purchase price $ 6,178.00
Expenses incurred 15,678.75
Crop loss 60,820.00
Mental anguish 125,000.00
Attorney's fees 69,225.00
 ___________
Total $276,901.75

The trial judge awarded Lafleur the following sums as damages against Deere:

Crop loss $55,388.03
Mental anguish, aggravation,
 stress and inconvenience 10,000.00
 __________
Total $65,388.03

The court of appeal, 478 So.2d 1390 and 478 So.2d 1379, found no merit in defendants' assignments of error which complained of the trial court's 1) refusing to *626 apply the express warranty provisions of the sale,[1] 2) holding that the grain drill was defective and the sole proximate cause of the Fontenot and LeFleur damages, 3) failing to reduce the jury's award of $125,000.00 in damages for mental anguish suffered by Fontenot, or not denying that portion of the damages entirely, 4) awarding damages to Lafleur for both economic loss and mental pain and anguish, 5) admitting into evidence a video tape which demonstrated the grain drill's operation, 6) refusing to allow defendants to introduce evidence on the issue of credits for use and 7) failing to reduce the jury's award to Fontenot of $69,225 in attorneys fees. Accordingly, the court of appeal affirmed the respective judgments against Deere and Hollier.
We granted writs primarily to consider relator's contention that the court of appeal erred in allowing damages for mental anguish or other nonpecuniary loss when the principal object of the contract was not intellectual enjoyment, and in the alternative, that the court of appeal erred in allowing these mental anguish or nonpecuniary damages to stand despite a lack of competent evidence to substantiate them. An incidental issue presented in the relators' assignments of error (in fact the only assignment of error in relators' writ application other than those relating to mental pain and anguish damages) concerns the admission into evidence of a video tape depicting the operation of the grain drill.

FACTS
In their opinion the court of appeal recited the following facts:
"For fifteen years prior to 1980, Fontenot worked as a laborer on Lafleur's farm. In 1980, Fontenot decided to start his own farm business on a 432 acre tract of land in Evangeline Parish and St. Landry Parish. In order to complete his 1980 soybean crop, Fontenot used $4,000.00 of his own money together with $71,000.00 that he borrowed from the F.H.A. and $6,000.00 that he borrowed from Lafleur. At that time Fontenot also entered into an agreement with Lafleur by which he agreed to plant and harvest Lafleur's 402 acres of soybeans in exchange for the use of Lafleur's farming equipment and bookkeeping system.
"To facilitate the planting of both crops, Fontenot purchased a John Deere 8300 grain drill with a Tru-Vee attachment, manufactured by Deere, from Hollier on April 8, 1980 for a purchase price of $6,178.00.
"One of the main selling features of the John Deere 8300 grain drill was that it is designed to accurately plant seeds at any depth selected by the farmer. The operation of the grain drill may be briefly explained as follows: The grain drill has a drill path with 16 runners which each plants one row of seeds. On each runner there is a disc blade which cuts into the soil to a pre-set depth and the seeds are dropped into the resulting trench. The depth of the trench is governed by a gauge wheel on each runner which controls the depth to which the disc blade cuts. The pressure of the disc cutting into the soil forces the gauge wheel on each runner all the way up to a stop at a pre-set position. As long as each gauge wheel reaches the pre-set stop position, the seeds will be planted accurately at the pre-set depth chosen by the farmer. However, if the force of the disc cutting into the soil does not force the gauge wheel up to the pre-set stop position, the disc blade will not cut deeply enough into the soil resulting in the seeds being planted shallower than the pre-set depth. Once the seeds have been dropped into the trench made by the disc blade, a "packing wheel" spreads dirt over the seeds so that they are adequately covered.
"On May 22, 1980, Fontenot started planting the soybean seeds with the John Deere grain drill set at a depth of 1½ to 1¾ *627 inches, which is the customary depth for planting soybeans. After planting only 40 or 60 yards, he stopped so that he and Lafleur could check every runner. The grain drill was planting at the proper depth so he proceeded with the planting. Lafleur then decided to ride on the tractor with Fontenot so that he could watch the drill plant while Fontenot was driving. They planted another 40 or 50 yards and stopped again to check the drill and found that all the runners were planting properly. They then planted another round and a half of the field, and they again stopped and checked the grain drill's seed placement. Fontenot and Lafleur thought the grain drill was working properly so Fontenot resumed planting. He planted 10 or 12 acres before he stopped to check the grain drill again. He checked several of the runners at this time and everything appeared fine. Since the grain drill seemed to be working properly, Fontenot thought it was only necessary to check it every 10 to 20 acres which he did and it appeared to be working properly.
"Fontenot had planted approximately 220 acres when he became ill on June 1, 1980 and was forced to stop planting. As a result, Lafleur began planting the remaining 614 acres on June 4, 1980. Lafleur testified that he randomly checked several runners every 80 to 100 acres and the grain drill seemed to be working properly. Before Lafleur finished planting the remaining acreage, Fontenot recovered from his illness. To insure that they would finish all of the planting within the prime time planting period, Fontenot and Lafleur borrowed an International Harvester planter from a friend and used both planters to complete their planting. On June 10, 1980, they finished planting the entire crop on all of their acreage.
"Sometime during the second week of June, Lafleur was cleaning the grain drill when he noticed that some of the gauge wheels which govern the planting depth were hard to move up and down. He found that the gauge wheels on only 2 or 3 runners in the drill path of 16 runners moved up easily. He thought they should move more freely on the rest of the runners so he checked the fields and found seeds lying only ½ inch deep in the fields planted with the John Deere grain drill. Lafleur showed this to Fontenot and they called a salesman at Hollier's, Ralph Miller.
"Miller inspected the fields and told them to wait a few days because if it rained their crop would come up anyway. One week and a half later it did rain, however, most of the crop still did not come up. At Hollier's request Deere's factory representative, Steve Hines, made a trip to Fontenot's farm to inspect the John Deere grain drill. He torqued the castellated nuts on the John Deere grain drill that govern the movement of the gauge wheels to 120 pounds and the gauge wheels would not move as freely as he wanted. Miller told Hines that one of Hollier's employees could adjust the grain drill to make it work correctly. The next day Miller sent Hollier's assembly man, Herb Hazelton, to adjust the John Deere grain drill. Hazelton loosened the castellated nuts, which were torqued at 120 pounds in accordance with the owner's manual, on each of the runners until he could move each gauge wheel freely by hand.
"In the meantime the soybean crop was not growing as one would normally expect. Photographs introduced into evidence showed some rows were growing at an acceptable rate while other rows directly adjacent to the healthy rows were barely growing, if at all. The F.H.A. county supervisor, Russell Gibson, examined the field sometime during June and he testified that the fields had "skip areas" just as were shown in the photographs. Gibson testified that the fields were striped with healthy rows and poor rows growing side by side. He estimated that 50% of the rows had no plants on them when he toured the field.
"After Fontenot harvested the disappointing soybean crop he had his crop and Lafleur's weighed separately. Lafleur's tracts produced an average of 6.33 bushels per acre and Fontenot's tracts produced an *628 average of 7.75 bushels per acre. The parish average for 1980 was 26.7 bushels per acre. The disappointing crop yield led both Lafleur and Fontenot to file their suits alleging that the John Deere grain drill was defective and that the defect caused them damage."
The court of appeal found the grain drill defective, and its condition the sole cause of the crop failure, affirming the trial judge and jury in the respective cases in this regard. They agreed with the fact finders' determination that Deere and Hollier had full knowledge of a defect in the John Deere 8300 grain drill prior to the time of its sale to Fontenot. The court of appeal found that the warranty limitations were not applicable and binding on Fontenot, citing Edwards v. Port AMC/Jeep, Inc., 337 So.2d 276 (La.App. 2nd Cir.1976), writ den., 339 So.2d 854 (La.1976); and Hendricks v. Horseless Carriage, Inc., 332 So.2d 892 (La.App. 2nd Cir.1976). The court of appeal therefore affirmed the judgments rendered in the lower court.
We address in this opinion only the three assignments of error urged in defendants' writ application. The first and second assignments of error concern the adequacy of proof and legal entitlement to mental pain and anguish damages.
As noted hereinabove, in addition to a $6,178.00 return of purchase price and the $76,498.75 in pecuniary loss ($15,678.75 for expenses and $60,820.00 for crop loss) Fontenot was awarded $125,000 for mental anguish, a distinctly nonpecuniary loss.[2]
Defendants take the position that La.Civ. Code art. 1934(3) and the interpretation of that article by this Court in Meador v. Toyota of Jefferson, Inc., 332 So.2d 433 (La.1976), bar the recovery of mental anguish damages in this case (one which they contend is in contract) since the contract does not have as its principal or exclusive object "the gratification of some intellectual enjoyment." (La.Civ.Code art. 1934(3))
Respondents question the correctness and continuing viability of Meador, supra. They contend, and the court of appeal stated, that "the Meador rule is no longer inflexibly applied to preclude awards of nonpecuniary damages" in breach of contract cases. This position is not well taken. In fact no opinion of this Court after Meador has repudiated its holding,[3] despite criticism by some Law Review commentators. See e.g., Litvinoff, Moral Damages, 38 La.L.Rev. 1 (1977); Johnson, The Work *629 of the Louisiana Appellate Courts for the 1976-77 TermObligations, 38 La.L.Rev. 345 (1978).
Furthermore, efforts to overrule Meador through legislation failed in 1984. With minor language change the Meador interpretation of La.Civ.Code art. 1934(3), that nonpecuniary damages are recoverable only where the contract has for its object gratification of intellectual enjoyment, has been incorporated in La.Civ.Code art. 1998 of the Obligations revision[4] passed in 1984.
Article 1998 now provides:
Art. 1998. Damages for nonpecuniary loss
Damages for nonpecuniary loss may be recovered when the contract, because of its nature, is intended to gratify a nonpecuniary interest and, because of the circumstances surrounding the formation or the nonperformance of the contract, the obligor knew, or should have known, that his failure to perform would cause that kind of loss.
Regardless of the nature of the contract, these damages may be recovered also when the obligor intended, through his failure, to aggrieve the feelings of the obligee.
So, today, nonpecuniary loss may not be recovered in a simple breach of contract case unless the contract is intended to gratify a nonpecuniary interest. The only changes to La.Civ.Code art. 1934(3) were to substitute a contract "to gratify a nonpecuniary interest" for a contract having "for its object the gratification of some intellectual enjoyment," and the specific inclusion in the new Article 1998 of the requirement that "because of the circumstances surrounding the formation or the nonperformance of the contract, the obligor knew, or should have known, that his failure to perform would cause that kind of loss" and which hardly adds anything. The addition of the latter requirement, one which was perhaps only implicit in C.C. art. 1934(3) and its interpretation in Meador, and the substitution of gratification of nonpecuniary interest for gratification of some intellectual enjoyment, serve to clarify and make more certain under the law the Meador resolution of the pertinent legal issue under the former article 1934(3).[5]
The Legislature's resolution might have been otherwise. The reporter for the Louisiana Law Institute recommended a revision which would have allowed "moral damages," damages for nonpecuniary loss, in all contract cases, with the only reservation being that recovery be "according to the nature of the contract, or according to the circumstances surrounding an obligor's failure to perform." He specifically recommended departing from the rule established in Meador v. Toyota of Jefferson, Inc., supra.[6] The Council of the Law Institute did not follow that recommendation, for, as was recited in the minutes of the council meeting of September 18, 1981, "[t]he important policy decision was to limit nonpecuniary damages to those types of contracts that were made to gratify nonpecuniary interests." La.Civ.Code art. 1998, as thus recommended by the Law Institute, *630 was adopted into law by the Legislature in 1984.
This case arose in 1980, before Art. 1934(3) was replaced by Art. 1998. Therefore, C.C. art. 1934(3) as interpreted in Meador is the law to be applied here. Nonpecuniary damages are not allowed in a simple breach of contract case unless the contract has for its object "the gratification of some intellectual enjoyment" (under the present article 1998, the counterpart standard is unless the contract because of its nature is "intended to gratify a nonpecuniary interest").
This does not, however, resolve the principal legal issue in this case, for mental pain and anguish damages are not barred in all cases which "sound" in contract, as will be discussed hereinafter. Meador was a simple service contract, repair of an automobile, which involved a delay in performance with attending aggravation and distress. There was no element of delictual conduct in that case. The case under consideration, on the other hand, involves the sale of a product and it contains delictual as well as contractual elements. See Chappuis v. Sears Roebuck & Co., 358 So.2d 926 (La.1978). The only difference between this case and those like Weber v. Fidelity & Casualty Ins. Co., 259 La. 599, 250 So.2d 754 (1971), and Chappuis, supra is that here personal injury damages are not involved.
A normal breach of contract not involving delictual conduct is governed, as respects damages, by La.Civ.Code art. 1934(3) (at present CC 1998). There are, however, contract situations where there occur damages by reason of fault which are distinct from and/or in addition to breach of a conventional obligation. Such is the case where a product is sold which is not reasonably safe for its intended use, and the purchaser or consumer suffers damages as a consequence. Weber held that breach of the obligation (to produce and deliver a product which is reasonably safe for its intended use) gives rise to a cause of action in favor of the purchaser of the product not only to demand return of the purchase price, but also, because the manufacturer is presumed to know of defects in its products, to demand all damages caused by the defect.[7] In this latter respect the manufacturer is charged with repairing all damages, just as is the tortfeasor. The law imputes knowledge of defects in a product to its manufacturer so that his act of delivering a defective thing "knowing" of the defect gives rise to delictual as well as contractual liability. Philippe v. Browning Arms Co., 395 So.2d 310, 319 (La.1981); Chappuis v. Sears Roebuck & Co., 358 So.2d at 929.
But what about the product which is not reasonably safe, but rather simply useless, that is, it contains a vice or defect which qualifies under C.C. art. 2520 (a "vice or defect in the thing sold, which renders it either absolutely useless, or its use so inconvenient and imperfect, that it must be supposed that the buyer would not have purchased it, had he known of the vice") and the seller knows of the vice (or impliedly does) and omits to declare it (La. Civ.Code art. 2545)? And what of the case distinct from Weber and its progeny in that the user has not suffered personal injury but rather just economic, or nonpecuniary loss? Does such a case, like Weber and Chappuis qualify as delictual with the customary tort damages being allowed, including mental pain and anguish? Is Deere in *631 this case, vendor of a useless grain drill, relative to the allowance and extent of damages, a simple obligor who under La. Civ.Code art. 1934(3) owes nonpecuniary damages only if it is found that his contract had for its object the gratification of some intellectual enjoyment? Or is Deere, like the Weber type manufacturer, essentially a tort feasor with obligation to pay tort damages including mental pain and anguish?
These are tough questions. The answer, for instance, would tell the intervenors, the Motor Vehicle Manufacturers Association of the United States, Inc., and the Product Liability Advisory Council, Inc., whether a new car purchase contract and breach thereof is governed by the new C.C. art. 1998, or rather, as relates to damages, by C.C. art. 2315. The resolution of these questions may ultimately involve line drawing by this Court, for in theory at least there is legal justification for deciding a) especially if personal injury is not involved, that the Legislature has clearly spoken to contract cases and said in C.C. art. 1998 that nonpecuniary damages are to be allowed only when the contract is intended to gratify a nonpecuniary interest, or conversely, b) although contractual, the manufacturer's duty is in tort as well, even where the fault is simply in performance of a contract and the attending damages merely pecuniary.[8]
We leave that decision for another day. These difficult questions need not be answered in this case because there is simply no way to allow plaintiffs the $125,000 and $10,000 respective mental pain and anguish damages which were awarded them in the district court. Plaintiff Lafleur presented absolutely no evidence whatever to support mental pain and anguish damages. Fontenot did not do much better; his proof was scant. He testified essentially that he worried over the loss of his car and the loss of his first wife, matters, he implied, which were caused by the financial difficulties brought on because of Deere's defective grain drill and his poor crop. Objections to this testimony by the defendants prompted the trial judge to disallow the questions and answers. The trial judge was correct. Those "consequences" were too remote. The only testimony, or other proof in the record, supporting mental pain and anguish damages is Fontenot's testimony, essentially, that he worried because he had never before owed so much money and because he knew that he would not be able to pay the money back. He implied that that worry was prompted by failure of his crop, which was in turn caused by purchase of the defective grain drill from Deere and Hollier.
Even if we were to answer the questions posed hereinabove and conclude that Deere was akin to a Weber or Chappuis type "tortfeasor" in a situation such as thisa useless product, consequent pecuniary loss without personal injury, worry over a worsening financial situation caused by the purchase of that useless productat the least we would have to conclude, and we do so conclude, that such worry is not within the scope of the risk to which is extended Deere's duty to deliver a useful grain drill. Dixie Drive It Yourself System, Inc. v. American Beverage Co., 242 La. 471, 137 So.2d 298 (1962); Cooks, Mental Anguish Arising From Property Damage, 3 So. U.L.Rev. 17, 27-29 (1976); Crowe, The Anatomy Of A TortGreenian, As Interpreted by Crowe Who Has Been Influenced By Malonea Primer, 22 Loy.L.Rev. 903, 916 n. 51 (1976).
With this conclusion, we need not address further defendant's assignment of *632 error which complains alternatively of the adequacy of plaintiffs' proof in support of the mental pain and anguish awards. For the reasons stated we conclude that plaintiffs are not entitled to the respective awards of $125,000 and $10,000 for mental pain and anguish.
We turn now to defendant's only remaining assignment of error. Defendants contend that the trial judge erred in allowing plaintiffs to play a video tape to the jury and trial court showing the plaintiffs' expert witness, Dr. Maher, torquing the bolt "D" on the grain drill with a torque wrench and showing how the torqued bolt affected the operation of the drill. The court of appeal declined to consider whether the video tape was objectionable for the stated reason that counsel for the defendants failed to object timely to the showing of the tape at trial. The court of appeal was of the opinion that the defendants' failure to object constituted a waiver of the right to object and that they could not urge the objection on appeal. Richard v. Southwest Louisiana Hospital Association, 383 So.2d 83 (La.App. 3d Cir.1980), writ denied, 385 So.2d 274 (La.1980). A review of the record indicates that the defendants did not fail to object to the introduction of the video tape. The court of appeal was mistaken in its contrary conclusion. In fact defendants filed a Motion in Limine objecting to the introduction of the video tape, inter alia, and that motion was overruled by the trial judge. The determination of whether motion pictures or video tapes are admissible is largely within the discretion of the trial court. Owens v. Thornton, 349 So.2d 431 (La.App. 4th Cir. 1977); Ashley v. Nissan Motor Corp. in U.S.A., 321 So.2d 868 (La.App. 1st Cir.1975), writ denied, 323 So.2d 478 (La.1975); Carvell v. Winn, 154 So.2d 788 (La.App. 3d Cir.1963), writ refused, 156 So.2d 603 (La. 1963). Furthermore the trial judge sustained defendants' objection as to the audio portion of the tape. The only thing viewed by the jury was Dr. Mayer, the plaintiff's expert, torquing the bolt "D" on the drill with a torque wrench, exhibiting the grain drill and showing how the drill functioned at different torques. The machine, although not set up as recommended in the owners' manual, was set up in substantially the same manner as it was when it was purchased new by Fontenot. The tape was shown without the sound, and Dr. Mayer was available for full cross-examination. We have viewed the video tape and do not perceive how defendants might have been prejudiced. The assignment of error is without merit.
Defendants complained in the court of the appeal of the jury's award of $69,225 for Fontenot's attorney's fees, contending it was an unreasonable sum.[9] That sum just happens to be exactly one-third of the gross jury award excluding the fee. The only evidence introduced at trial to support Fontenot's claim for attorney fee was the one-third contingency fee contract with his lawyer. The court of appeal stated that an award of attorney's fees may be based on the litigant's contingency fee contract where the resulting amount is reasonable, citing Pillow v. Board of Commissioners, 425 So.2d 1267 (La.App. 2d Cir.1982), writ denied, 445 So.2d 1225 (La.1984). They properly pointed out in determining what is a reasonable amount for statutorily imposed attorney's fees in a redhibition case, the following factors which courts have deemed relevant:
(1) The responsibility incurred
(2) The extent and nature of the work performed

*633 (3) The legal know how and skill of counsel. Sokol v. Bob McKinnon Chevrolet, 307 So.2d 404 (La.App. 4th Cir.1975). Anselmo v. Chrysler Corp., 414 So.2d 872 (La.App. 4th Cir.1982).
The court of appeal went on to affirm the attorney's fee award. They felt that there had been no abuse of discretion in the $69,225 award.
In light of the fact that the jury's award of attorney's fees represented precisely one-third of the damages otherwise awarded Fontenot (namely $207,676.75), and inasmuch as in this opinion we have reduced the allowable damages by $125,000, to $82,676.75, we deem it necessary to reduce the attorney's fee as well. Upon consideration of the above enumerated factors, we find that a $27,558.91, or one-third of the $82,676.75 allowed damages, is appropriate.

Decree
For the foregoing reasons the judgments of the district court and court of appeal are affirmed in part and amended in part. There is deleted from Lafleur's judgment $10,000 for "mental anguish, aggravation, stress and inconvenience" and there is deleted from Fontenot's judgment $125,000 for "mental anguish," with a corresponding reduction of the portion of the total award for attorney's fees, from $69,225 to $27,558.91
JUDGMENT AFFIRMED IN PART; AMENDED IN PART; AND REMANDED TO THE COURT OF APPEAL.
DIXON, C.J., and LEMMON, J., concur.
MARCUS, J., concurs and assigns reasons.
DENNIS, J., concurs in the result.
MARCUS, Justice (concurring).
I subscribe to the majority opinion; however, I would prefer simply to apply La.Civ. Code art. 1934(3) (art. 1998 under the current law) in this case which does not involve personal injury. Nonpecuniary damages are allowed only when the contract is intended to gratify a nonpecuniary interest and that is not the case here. Accordingly, I respectfully concur.
NOTES
[*] Blanche, J., retired, participated in this case ad hoc, in place of Cole, J., the matter having been heard and submitted before Justice Cole replaced Justice Blanche on the Court.
[1] On the rear of the contract of sale it was stipulated that the dealer, John Deere or any company affilliated with John Deere would not be liable for incidental or consequential damages or injuries, including but not limited to loss of crops, loss of profits, rental of substitute equipment or other commercial loss.
[2] The judgment also gave Fontenot $69,225.00 for attorneys fees, a matter which will be discussed hereinafter.
[3] In Gel v. Markey, 387 So.2d 1162 (La.1980) this Court, in dicta, pointed out that the general nonavailability of mental anguish damages in breach of contract cases has been criticized as an inflexible rule that could work injustice in cases of real emotional distress incident to one party's breach of a contractual obligation. 387 So.2d at 1163. Although certiorari was granted to decide whether a tenant may recover damages for emotional distress resulting from the destruction of his property caused by a defect in the premises, the Court did not decide the issue, for there was insufficient evidence in the record to support an award for emotional distress. In Philippe v. Browning Arms Co., 395 So.2d 310 (La.1980) this Court held that an injured plaintiff had stated a cause of action in tort and in redhibition and is entitled to reasonable attorney's fees under La.Civ.Code art. 2545 for the defective condition in the product, where a dentist sued a shotgun manufacturer for injuries he sustained when the shotgun accidentally discharged. Philippe was a products liability case with the significant delictual aspects which attend such cases (note the discussion in this respect hereafter in this opinion). And, with respect to the court of appeal cases cited in brief by relators, Carroll v. State Farm Insurance Co., 427 So.2d 24 (La.App. 3rd Cir.1983), and Franklin v. Able Moving and Storage Co., Inc., 439 So.2d 489 (La.App. 1st Cir.1983), are inapposite because they involve mental anguish claims arising in tort, not breach of contract (and in neither case was a writ application filed in this Court). Pike v. Stephens Imports, Inc., 448 So.2d 738 (La.App. 4th Cir.1984) was a redhibition case, but like Carroll and Franklin, no writ application was filed here. Ducote v. Arnold, 416 So.2d 180 (La.App. 4th Cir.1982), writ denied 421 So.2d 238 (La.1982) was denied because the judgment was not final. Bourne v. Rein Chrysler Plymouth, Inc., 463 So.2d 1356 (La.App. 1st Cir.1984), writ denied, 468 So.2d 570 (La. 1985) was also a redhibition case in which this court denied writs. Writ denials are not authoritative; they do not make law. Block v. Reliance Ins. Co., 433 So.2d 1040 (La.1983).
[4] 1984 La. Acts No. 331.
[5] No longer can a claimant even argue, as was argued unsuccessfully in Meador, that one may recover breach of contract damages when the object of the contract is purely physical gratification because of the disjunctive "or" preceding "some inconvenience" in the former C.C. art. 1934(3). See 332 So.2d at 435. Article 1998 today makes it perfectly clear that damages for nonpecuniary loss may only be recovered when the contract because of its nature is intended to gratify a nonpecuniary interest.
[6] The reporter's proposal was: "Moral damages [Damages for pecuniary loss] may be recovered according to the nature of the contract, or according to the circumstances surrounding an obligor's failure to perform. Such damages shall not be recovered for mere worry or vexation." His comment which attended the proposed article when presented to the Council of the Law Institute was:

(a) This article is new. It changes the law in part since it provides that moral damages may be recovered also for the failure to perform an obligation arising from a contract whose object is not for the exclusive "intellectual enjoyment" of the obligee, thereby departing from the rule established in Meador v. Toyota of Jefferson, Inc., 322 So.2d 802 (1976).
[7] As was noted in Philippe, 395 So.2d at 318, n. 15:

"The long-standing jurisprudence of this state imputes knowledge of defects in a product to the manufacturer of the product. See, for example, Doyle v. Fuerst & Kraemer, 129 La. 838, 56 So. 906 (1911). The Weber case extended the presumption of knowledge of a defect to cases in which the defect caused personal injuries.
"The primary purpose of the presumption, of course, is to prevent a manufacturer from placing into the stream of commerce a thing which is not reasonably safe for its intended use. Another consideration is the public policy of placing the burden of accidential injuries caused by products upon those who market the products and can treat the cost of insuring against these injuries as a cost of production. Restatement (second) of Torts 402A, Comment C."
[8] In the Meeting of the Council of the Law Institute which preceded the Institute's recommendation and the Legislature's adoption of La. Civ.Code art. 1998 in place of C.C. art. 1934(3), over the protest of the reporter who recommended the article on "moral damages" and who stated that the five articles on damages were designed for application in both tort and contract cases, the Council specifically voted in favor of a motion that the articles under consideration (present Civil Code articles 1994, 1995, 1996, 1997 and 1998) be limited to conventional obligations and ultimately recommended articles including C.C. art. 1998 which specifically addressed damages in connection with contracts only.
[9] The lower courts correctly cast both defendants, Deere, manufacturer, and Hollier, retail seller, for attorney's fees for the trier of fact specifically found both to have had actual knowledge of the defect. La.Civ.Code art. 2545 provides:

Art. 2545. Liability of seller for concealment of vice
The seller, who knows of the vice of the thing he sells and omits to declare it, besides the restitution of price and repayment of expenses, including reasonable attorney's fees, is answerable to the buyer in damages.
It is worth noting, however, that absent a finding of actual knowledge, Weber imputes knowledge of a defect only to the manufacturer and not to the seller.